BERTRAM M. CAMPBELL, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28125.)

Court of Claims, June 17, 1946.

*James C. Webster* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson, Donald C. Glenn* and *Joseph A. Drago* of counsel), for defendant.

BARRETT, P. J.   Claimant, married and the father of three children then aged respectively four, six and eight years, and living with his wife and children at Freeport, Long Island, about a month before February ·23, 1938, was taken to police headquarters in the city of New York and questioned for the greater part of the day in reference to the commission of certain crimes.   He was again similarly questioned on February 23, 1938, and on that day was arrested, charged with forgery, taken to police headquarters and then remanded to the Tombs Prison in New York City.   On March 1, 1938, the charges were dismissed and he was rearrested upon a ten-count indictment charging forgery in the second degree and grand larceny in the first degree and sent to the Tombs where he remained until March 4, 1938, when he was released on bail.   In the indictment he was charged in substance with forging a check on November 15, 1937, in the sum of $4,576, drawn on the Central Hanover Bank and Trust Company and in opening an account on November 19, 1937, in the name of George Workmaster, to whom the check was payable, in the Trust Company of North America, and depositing said check therein.   It was also charged in substance that on November 23, 1937, claimant forged another check in the sum of $3,000, drawn on the Central Hanover Bank and Trust Company and that on the same day he deposited that check in the account that he had opened in the Trust Company of North America on November 19, 1937, and that on the same day he forged a check in the sum of $2,500 upon that account and that on November 26, 1937, he forged a check in the sum of $1,660 on that account.

On April 5, 1938, he was again arrested on another indictment and again sent to the Tombs.   On May 10, 1938, he was brought to trial on the ten-count indictment in the Court of General Sessions of New York County.   No testimony was offered on May 11th or May 12th, but on May 13th the trial

was resumed. Claimant testified in his own behalf denying the charges. On May 17, 1938, he was convicted of forgery, second degree, on the second, fifth, eighth and tenth counts of the indictment and on June 3, 1938, he was sentenced to serve not less than five years and not more than ten years in State prison on the second count and not less than five years or more than ten years on the fifth, eighth and tenth counts, the sentences to run concurrently with the sentence on the second count. He was not tried on the second indictment which was dismissed on August 29, 1945. During the trial he was confined in the Tombs and remained there until June 9, 1938, when he was taken in a police wagon, to the railroad station, and thence by train to Sing Sing Prison to serve his sentence. There he was searched, fingerprinted, photographed for the rogues' gallery, shaved, bathed, given prison clothes, given a number and assigned to a cell. He was afterward assigned to other quarters and all told was confined for three years, two months and thirteen days in that prison. It is not necessary to relate specifically the horrors of his confinement or the sufferings he endured in prison all of which is described in graphic detail in the testimony of claimant on this hearing. On July 3, 1941, he appeared before the parole board and on August 22, 1941, he was paroled under certain conditions, among them being that he must report to a parole officer once a month, that he must not go to New York City or operate a motor vehicle. Another man confessed to the commission of the crimes for which claimant had been convicted and claimant was pardoned by Governor Thomas E. Dewey on August 28, 1945. On October 25, 1945, upon motion of claimant, the indictment was ordered dismissed by Hon. JOHN A. MULLEN, Judge of the Court of General Sessions of the County of New York, and on November 20, 1945, Judge MULLEN signed the order vacating and setting aside the judgment of conviction and dismissing the indictment. On January 9, 1946, Governor Dewey in his message to the opening session of the 1946 Legislature urged the passage of a special law, permitting claimant to recover from the State, the damages to which he was justly entitled. On January 29, 1946, chapter 1 of the Laws of 1946 became a law with the approval of the Governor and this claim was filed on February 21, 1946, pursuant to said act. By this statute, the State waived its immunity from liability and jurisdiction was conferred upon this court to hear, audit and determine the claim of claimant against the State for damages sustained as a result of and in connection with his trial and

erroneous conviction based on a case of mistaken identity, "as a claim founded in right and justice or in law and equity against the state of New York and morally and equitably presently payable," arising from the facts and circumstances of his conviction and imprisonment. Those facts and circumstances were set forth in detail and the act further provides: "If the court finds the facts to be substantially as hereinbefore set forth and finds that the claimant sustained damages as a result thereof, damages, including loss of earnings and compensation for the indignities and the shame and humiliation and loss of liberty and civil rights and the degradation and loss of reputation and the mental anguish suffered by claimant as a result of and in connection with his erroneous conviction and imprisonment shall constitute a valid and legal claim against the state, and the state shall be liable therefor, and the court may award to and render judgment for the claimant and against the state in such sum as the court shall find to be just and equitable."

While no constitutional objection was interposed by the State and while the court stated at the conclusion of the case that claimant had established a valid claim against the State, it is deemed advisable to note that the special law is not in contravention of the Constitution of the State of New York. By section 19 of article III of the Constitution of the State of New York the Legislature is prohibited from auditing or allowing any private claim or account against the State and by section 8 of article VII of the Constitution it is provided that neither the money nor credit of the State shall be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking.

It has however, been held that while the Legislature may not sanction a gift of public moneys for private purposes, it may in certain instances acknowledge the justice of a private claim against the State and provide for its audit and allowance by the Court of Claims, providing that the claim appears to the judicial mind and conscience to belong to a class of claims concerning which in the exercise of a wide discretion, the Legislature might reasonably say are founded in equity and justice and involve moral obligations upon the part of the State which the State should satisfy. (*Farrington* v. *State*, 248 N. Y. 112. To the same effect are *Williamsburgh Savings Bank* v. *State*, 243 N. Y. 231; *Munro* v. *State of New York*, 223 N. Y. 208; *Cole* v. *State of New York*, 102 N. Y. 48; *O'Hara* v. *State of New York*, 112 N. Y. 146; *Lehigh Valley R. R. Co.* v. *Canal*

*Board,* 204 N. Y. 471; *Wheeler* v. *State of New York,* 190 N. Y. 406; *Cayuga County* v. *State,* 153 N. Y. 279.)

In the special act it is provided that if the court finds the facts to be substantially as set forth therein, the resulting damages shall constitute a valid and legal claim against the State. This provision, however, does not relieve this court of deciding not only whether the facts are as set forth but also of determining whether such facts when established constitute a legal and valid claim against the State. (*Williamsburgh Savings Bank* v. *State, supra.*)

In the cited cases the Legislature made possible the recognition of moral obligations upon the part of the State, and provided that compensation might be made for damages caused by loss of property or from personal injuries. Here, the facts present a stronger case than in the cited authorities for the recognition of a moral obligation upon the part of the State to compensate claimant who though innocent of the crimes with which he was charged was compelled to undergo the sufferings and effects of a long term in prison.

" The Constitution does not prohibit the Legislature from doing in behalf of the State what a fine sense of justice and equity would dictate to an honorable individual." (*Ausable Chasm Co.* v. *State of New York,* 266 N. Y. 326, 331.)

We find the facts to be substantially as stated and conclude under the authorities that the act authorizing this court to hear, audit and determine this claim is a proper exercise of legislative power not prohibited by the Constitution of the State of New York, and that claimant has established a legal and valid claim against the State.

Claimant was tried in accordance with the orderly processes of criminal proceedings. There was no malice toward him upon the part of any official connected with the proceedings. His conviction was the result of mistaken identity. But claimant suffered grieviously during his long term in prison and while on parole resulting from his arrest, conviction and confinement for the commission of crimes of which he was innocent. He was branded as a convict, given a prison number and assigned to a felon's cell. He was deprived of his liberty and civil rights. He was degraded in the eyes of his fellow men. His mental anguish was great by reason of his separation from society and from his wife and family and in being deprived of the opportunity to afford them a living which they were compelled to seek from public authorities. He suffered the miseries of prison life and his confinement was doubly hard because he

was innocent. He was the victim of a miscarriage of justice but fortunately for him the State has undertaken to rectify the mistake as far as possible.

He served seventy-six days in the Tombs, three years, two months and thirteen days in Sing Sing Prison and was on parole four years and six days. Seven years, six months and five days elapsed from claimant's arrest until he was pardoned.

Claimant in 1928 earned in excess of $10,000 and in 1929 over $15,000. His average annual earnings for the ten years extending from 1928 to 1937, inclusive were $6,916.74. After his release on parole he worked for $25 a week and at the time of the trial was employed at $50 a week.

It is conceded that his damages caused by loss of earnings amount to the sum of $40,000. He is clearly entitled to substantial additional damages. The amount is not easy to determine. The prior cases upon that question are of little value in fixing the amount.

After a careful review of the facts it is found that claimant is entitled to an award including damages for loss of earnings, in the sum of $115,000, in accordance with the accompanying decision.