**UNITED STATES ex rel. Santo CAMINITO, Relator-Appellant,**

**v.**

**Robert E. MURPHY, as Warden of Auburn Prison, State of New York, Respondent-Appellee.**

**No. 251, Docket 23492.**

United States Court of Appeals Second Circuit.

Argued April 11, 1955.

Decided May 11, 1955.

Caminito and two others, Bonino and Noia, were indicted by a New York Grand Jury for the murder of Murray Hameroff. At the trial, the State offered in evidence Caminito's signed confessions that he had participated in an attempted holdup of Hameroff as a result of which Hameroff was shot to death. The jury found the three defendants guilty of a felony murder. Pursuant to the jury's recommendation, they were sentenced to life imprisonment. Caminito and Bonino appealed. The Appellate Division, People v. Caminito, 265 App.Div. 960, 38 N.Y.S.2d 1019, affirmed without opinion. The New York Court of Appeals affirmed without opinion, People v. Bonino, 291 N.Y. 541, 50 N.E. 2d 654, and denied a motion for reargument, People v. Caminito, 297 N.Y. 882, 79 N.E.2d 277. The United States Supreme Court denied Caminito's petition for certiorari, 348 U.S. 839, 75 S.Ct. 46. He then filed a petition for a writ of habeas corpus in the court below. This petition was denied. The judge signed a certificate of probable cause. Caminito has appealed to this court.

Kaufman & Edelbaum, New York City (Maurice Edelbaum, New York City, and Stanley L. Gluck, Brooklyn, N. Y., of counsel), for relator.

Edward S. Silver, Dist. Atty., Kings County, N. Y., Brooklyn, N. Y., and Jacob Javits, Atty. Gen. of New York (William I. Siegel, Brooklyn, N. Y., of counsel), for respondent.

Before CLARK, Chief Judge, and FRANK and HASTIE, Circuit Judges.

FRANK, Circuit Judge.

The sole evidence of Caminito's guilt consisted of his signed pre-trial confessions. At the trial, his counsel timely objected to their admission, and moved to strike them on the ground that they had been unconstitutionally procured; he also moved to dismiss the indictment on the ground that the State had not proved Caminito guilty. Caminito testified that the police had coerced the confessions. The trial judge left to the jury the question whether the confessions had been thus induced. The jury, by returning a verdict of guilt, found that they were voluntary.

Caminito testified that, before giving the confessions, the police had beaten him. As the police testified to the contrary, we shall ignore that part of his testimony. But the following facts are not disputed.

(1) Caminito was taken into custody by the police on Sunday, May 11, 1941 at 6 P. M.

(2) Commencing about 9 P. M. Sunday, he was continuously interrogated by five or six police officers for a period of approximately five hours, until 2 A. M. the following morning, Monday, May 12th.

(3) At 3 A. M. on Monday, May 12th, he was locked in a cell in which there were no bed, blankets, spring or mattress, but only a wooden bench.[1] (He testified that the cell was unheated. A witness for the State testified that the cell was equipped with a radiator but that he "did not know if the heat was on" during the time Caminito was there confined.)

(4) At 10 A. M. on Monday, May 12th, the questioning was resumed. The interrogation continued all day, with several detectives taking turns.

(5) Members of Caminito's family, his friends and an attorney retained by the family, called at the station house where he was detained and tried to get information concerning his whereabouts. The

---

1. Caminito testified that he was unable to sleep in the cell.

police officers knew these facts, but kept him incommunicado. Other than the police and the District Attorney, no one was permitted to see him until he was arraigned forty hours after being taken into custody.

(6) During the afternoon of Monday, May 12th, two women and a man were brought in to face Caminito. He was not told that they were detectives. Each falsely pretended to identify him as the person who was sitting at the wheel of the automobile at the time of the shooting, which occurred in connection with the holdup.[1a]

(7) About 9 P. M., Monday, May 12th, twenty-seven hours after having been taken into custody, he signed a confession. He gave a second confession to a District Attorney a short time later.

(8) About 2:30 or 3 A. M. the following morning, Tuesday, May 13th, he was first placed under arrest.

(9) He was brought before a magistrate later that same day, more than forty hours after having first been taken into custody. The arraignment could and should have been held long before that time. The police officers knew that the courts were open for that purpose.[2]

(10) Caminito had never been previously arrested or convicted.[3]

These facts make it clear that the trial did not measure up to the standards prescribed by the due process clause of the 14th Amendment. The confessions obtained by these loathsome means were no more evidence than if they had been forged. Absent, then, any admissible evidence of guilt, the trial judge should have dismissed the indictment or directed a verdict of acquittal. To jail a man convicted without evidence of guilt is to impose "involuntary servitude" which, "except as a punishment for crime," the Thirteenth Amendment forbids. Only in Erewhon, which recognized "the crime of being maligned unjustly,"[3a] could this conviction be justified.

Alone or together, neither the unlawful detention for many hours nor the deceit in confronting Caminito with disguised police officers who lied in identifying him [4] would suffice to vitiate the

---

1a. At the trial, in his opening statement to the jury, the District Attorney said:

"The following morning the detectives decided something had to be done if they were going to get anywhere with this case. They thereafter sent to New York for two female detectives from the Pickpocket Squad and another detective named Gavin, who they thought looked nothing like a detective, and these defendants were placed in a room and one by one these witnesses, alleged witnesses, were brought in, and they ostensibly identified these defendants as perpetrators of the crime, although they were not actually witnesses to the crime."

2. New York City Criminal Courts Act "§ 101. Courts to be held daily in each district

"Except as otherwise provided in this section, there shall be a city magistrate's court held daily in every court district, and unless otherwise directed by the chief city magistrate, each city magistrate's court shall be open every day at nine o'clock in the morning, and shall not be closed before four o'clock in the afternoon, and the city magistrate assigned thereto shall be in attendance thereat except during a reasonable recess."

3. Although Judge Foley denied the writ, he said in his opinion [127 F.Supp. 691]:

"Of course, there are many factors that are disturbing and cause suspicion. The holding of the defendants incommunicado, the sleeping on a hard bench without pillow or blankets in a cell probably not overheated, the failure to arraign without unnecessary delay as provided by law, the admittedly false identifications, the intensive questioning by relays of detectives,— this combination together with the fact that the relator had never been arrested or convicted, would cause hesitation and suspicion on my part. So would the fact that there is little, if any, independent evidence connecting the relator with the commission of the crime."

3a. Butler, Erewhon (2d ed. 1901) Chapter 11.

4. These lies might well have reinforced the coercion in bringing about the confession. "A weak suspect, regardless of his guilt or innocence, may succumb to coercion, partly because of the apparently strong case against him." Meltzer, Involuntary Confessions, 21 Un. of Chi.L.R. (1954) 317, 332 note 69.

confessions as unconstitutionally obtained. But those factors did aggravate the following unconstitutional practices which—even in the absence of those factors—rendered the confessions inadmissible: (a) The police interrogated him almost continuously for 27 hours, with but a brief interval for rest in a cell so badly equipped as to make sleep virtually impossible for a man already harried by the questioning. (b) During this long period, the police, in effect, kidnapped him: They kept him incommunicado, refusing to allow his lawyer, his family, and his friends to consult with him.

Accordingly, the writ of habeas corpus must issue. See Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Haley v. Ohio, 332 U.S. 596, 68 S. Ct. 302, 92 L.Ed. 224; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L. Ed. 1029; Ashcraft v. Tennessee, 322 U. S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. Whether Leyra v. Denno, modified Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522—and if so, how far—we need not consider, as the undisputed facts here distinguish the instant case from Stein. Why the upper New York courts did not reverse the conviction we do not know, as they filed no opinions.

All decent Americans soundly condemn satanic practices, like those described above, when employed in totalitarian regimes. It should shock us when American police resort to them, for they do not comport with the barest minimum of civilized principles of justice. It has no significance that in this case we must assume there was no physical brutality. For psychological torture may be far more cruel, far more symptomatic of sadism. Many a man who can endure beatings will yield to fatigue. To keep a man awake beyond the point of exhaustion, while constantly pummelling him with questions, is to degrade him, to strip him of human dignity, to deprive him of the will to resist, to make him a pitiable creature mastered by the single desire—at all costs to be free of torment. Any member of this or any other court, to escape such anguish, would admit to almost any crime. Indeed, the infliction of such psychological punishment is more reprehensible than a physical attack: It leaves no discernible marks on the victim.[5] Because it is thus concealed, it has, under the brutalitarian regimes, become the favorite weapon of the secret police, bent on procuring confessions as a means of convicting the innocent.

Caminito testified as follows as to why he confessed: At 10:30 P. M. on Monday, May 12th, the police allowed him to talk to Noia who had been similarly subjected to prolonged questioning. "He said, 'Let us give them (the police) the same story they gave us.' He says, 'It would not mean anything. * * * We can see a lawyer this way. We will tell the lawyer what happened, and they cannot do us nothing. We did not do it. You don't have to worry. You can prove where you were, and I can prove also.' I said 'No it is not right.' He said, 'How long can I stand this? * * * Let us make up the story they gave us and give them the same story and get it over with.' * * * So I told him the story that the detectives had told me of what happened, as I had heard maybe fifty times, so he said, 'That is the story they told me.'" They then agreed to confess. While confessing, when Caminito did not know the desired answer, the police captain told him what to say and he said it. "They put the words right in his mouth." He "gave those answers for fear." We do not rest our decision on that testimony:[6] Even with-

---

5. Perhaps it is inaccurate to describe such punishment as not "physical," since pronounced fatigue may have hidden physiological consequences.

6. The State makes much of the fact that, as to one single item of the confession, he testified that he had made it up without prompting.

out it, we are bound to infer, on the undisputed facts, that something of the sort actually happened. For his testimony in this respect closely resembles many reports of those who, behind the Iron Curtain, after like treatment, confessed to crimes they had not committed.[7]

Aristotle, thousands of years ago, wrote of torture "that people under its compulsion tell lies quite as often as they tell the truth, sometimes persistently refusing to tell the truth, sometimes recklessly making a false charge in order to be let off sooner. We ought to be able to quote cases, familiar to the judges, in which this sort of thing has actually happened. We must say that evidence under torture is not trustworthy, the fact being that many men whether thick-witted, tough-skinned, or stout of heart endure their ordeal nobly, while cowards and timid men are full of boldness till they see the ordeal of these others; so that no trust can be placed in evidence under torture."[8] In the 16th century, Montaigne said that tortures "seem to be a test of endurance rather than of truth. For why should pain rather make me say what is, rather than force me to say what is not? * * * The effect is that the man whom the judge has put to the torture, that he may not die innocent, is made to die both innocent and tortured."

It is imperative that our courts severely condemn confession by torture, the so-called "Third Degree." To treat it lightly, to condone it, encourages its continued use, with evil effects on the police: The official who utilizes the Third Degree, since he violates statutes and the Constitution, is himself a criminal; and his infliction of torture on others brutalizes him.[9]

Hall remarks [9a] on the "startling fact that there is hardly a single physical act of brutality inflicted by the * * * N.K.V.D. which American policemen

7. In 16th century England, men suspected of treason were often physically tortured. But some received treatment like that the police used on Caminito. "One of the constant pleas of the victim was, in the pathetic words of ·Thomas Cromwell, 'not to make him languish long.'" Smith, English Treason Trials and Confessions in The Sixteenth Century, 15 J. of Hist. of Ideas (1954) 471, 483–484.

We are wont to think of torture as an accepted medieval mode of obtaining confessions. However, Lucas De Penna, a 14th century Italian lawyer, complained of that usage, although it was then legal to some extent. Such confessions, he wrote, "can have no value as evidence." Confessions not voluntarily given in the presence of a judge, he said, should not be received. See Ullman, The Medieval Idea of Law (1946) 159–160.

8. The Roman view, expressed in the Digest, was that reliance on evidence received by torture "is a frail and risky thing, likely to be most deceptive. For most men through their suffering, or the cruelty of torture, so despise torture that the truth cannot be extracted from them; others are so incapable of endurance that they prefer to lie rather than suffer torture." See Best, Evidence (12th ed.) 476 note.

9. See Warner, How Can The Third Degree Be Eliminated? 1 Bill of Rights Rev. (1940) 24, 26–27: "That the third degree ought to be eliminated is obvious, for it degrades the police, destroys public confidence in them and confirms the anti-social attitudes of its victims. Torturing a man even for the laudable purpose of making him confess his guilt, divulge the names of his accomplices or tell where he hid the stolen goods, must inevitably have a hardening and debasing influence on the inquisitor. Besides the defilement of the officer does not end when he has secured the confession, for it will not do for him to admit how he obtained it. If he did, the confession would not be admissible in evidence and even if it were, no jury would believe it. There would also be danger that the jury would be so incensed that it would acquit the defendant as the best method of rebuking the police, even though other evidence proved him guilty. Hence police officers using the third degree are strongly tempted not to let a nice regard for truth stand in the way of the conviction of a guilty man. If the praiseworthy desire to convict a criminal justifies giving him the third degree, surely it will countenance a little perjury especially by a police officer who has heard his confession and so knows that he is guilty!"

9a. Hall, Police and Law in Democratic Society, 28 Ind.L.J. (1953) 133, 140.

have not at some time perpetrated" (but adds that our police are less "scientific" about torture). The important difference is that in Russia the coercion of confessions is (at least with respect to some subjects) legal and avowed while with us it is always illegal and secret. That difference is basic: It means that we have a principle of justice on which we can rely to bring such coercion into disrepute and disuse.

That principle the police traduce when they act on the theory that, to discharge their duty, they have the authority to dispense with a suspect's constitutional privileges because they believe him guilty. For it is not the function of the police in our democracy to determine a man's guilt.[9b]

Trials fairly conducted have, alas, led to the conviction of some innocent men.[10] All such tragedies cannot be avoided even in the best contrived of legal systems. But surely we dare not permit tragedies of that sort to result from confessions by torture. One shudders to think what

happens to an innocent man sent to jail.[11] Bitter, resentful, he may become an apt student of the hardened professional criminals he meets in jail, and thereby be converted from innocence into real criminality.[12] If he withstands such a conversion, he will, as a marked man, when released, have a hard struggle to earn an honest living.[13] If again charged with crime, he will encounter a serious difficulty at a trial: If he takes the witness stand, his previous conviction will count against him; if, on that account, he does not testify, his silence will adversely affect him. And let it not be forgotten that police zeal to convict an innocent man means often that the guilty man escapes punishment.

We have here at some length expressed our abhorrence of confession by torture for this reason: That practice is unknown in England where, to our shame, they call it the "American method." There are those who say that American conditions compel such official resort to crime to catch and convict

---

9b. Cf. People v. Rogers, 303 Ill. 578, 136 N.E. 470.

10. See Borchard, Convicting The Innocent (1932). Since 1932, the public records reveal dozens of such cases.

The most recent, reported in the press, on April 15, 1955, is the case of Leonard Harkins who spent 19 years in jail, and who was pardoned because others confessed to the crime, exculpating him.

11. See Campbell v. State of New York, 186 Misc. 586, 590, 62 N.Y.S.2d 638, 642: "Claimant was tried in accordance with the orderly processes of criminal proceedings. There was no malice toward him upon the part of any official connected with the proceedings. His conviction was the result of mistaken identity. But claimant suffered grievously during his long term in prison and while on parole resulting from his arrest, conviction and confinement for the commission of crimes of which he was innocent. He was branded as a convict, given a prison number and assigned to a felon's cell. He was deprived of his liberty and civil rights. He was degraded in the eyes of his fellowmen. His mental anguish was great by reason of his separation from society and from his wife and family and in being deprived of the opportunity to afford them

a living which they were compelled to seek from public authorities. He suffered the miseries of prison life and his confinement was doubly hard because he was innocent."

12. See, e.g., Hentig, 39 J. of Cr.L. (1938) 18; Haynes, 39 J. of Cr.L. (1948) 432.

Phelan, Tramp at Anchor (1954), writes that a "convict retains his reason and maintains his initiative exactly to the extent that he learns furtiveness, deceit, suspicion, sleight-of-hand and predatory alertness. His survival depends on the speed with which he can learn to behave like a professional thief."

13. See, e.g., O'Leary, The Twilight World of The Ex-Convict, The Reporter, June 8, 1954, p. 38.

See also Red Smith, New York Herald Tribune, November 4, 1953: "It is high time someone asked a question: What's wrong with hiring ex-cons? If someone doesn't hire them, they won't remain ex-cons indefinitely. * * * Where is he supposed to find employment? In a dark doorway, with a blackjack. * * * If the aim is to drive all ex-cons back to crime and prison, the surest method of accomplishing it is to shut off opportunities for an honest living."

criminals. The absurdity of such a view is evidenced by the fact that our most effective American police force, the FBI, abjures this execrable method and, in its school for state and city police, teaches that the "third degree" is both detestable and inefficient. Because proof, in court, of its use is most difficult,[13a] the only real hope for its eradication lies in the educative influence of such police as the FBI, so that all our American policemen will be trained to detest it.[14] Repeated and emphatic judicial denunciations of that barbarism—whenever it is exposed, as in this case—can help to that end. Until that end is realized, the many decent police officers, in a police force generally addicted to that practice, will find themselves at so grave a disadvantage that sooner or later, they may, if they do not themselves indulge in it, at least acquiesce in it. For the accustomed ways of any group usually come to seem the right ways. As Chesterton said,[15] "The horrible thing about all legal officials, even the best, about all judges, magistrates, detectives and policemen, is not that they are wicked (some of them are good), not that they are stupid (several of them are quite intelligent); it is simply that they have got used to it."

At any rate, as long as many policemen third-degree the helpless, the public will tend to believe that all police officers do likewise, that police brutality, although unfortunate, is normal. (That such a belief is widespread, anyone can see who reads the hundreds of popular, hard-boiled, detective novels.) As a consequence, the public suspects that almost all policemen deal brutally with suspects. Accordingly, the citizenry do not regard the police with respect, and fail adequately to cooperate with the police, a cooperation without which the police in a democracy cannot efficiently perform their lawful functions.[15a] Worst of all, public cynicism develops concerning the basic ideals expressed in our constitution.

As we said in 1947, in In re Fried, 2 Cir., 161 F.2d 453, 459–460: "The 'third degree' and cognate devices alarmingly persist in this country. The reports of the United States Supreme Court alone disclose eight cases in the six years 1940–1945 in which convictions were reversed because of the use of coerced confessions. The indications are that the following statement, made in 1930 by a Committee of the American Bar Association, could be made today: 'It is conservative to say that for every one of the cases which do by a long chance find a place in the official reports, there are many hundreds, and probably thousands of instances of the use of the third degree in some form * * *.' Until such miserable misbehavior is stamped out, it will remain an empty boast that we have, and that we respect, a Constitution which guarantees civil liberties, blocks representatives of government from lawless incursions on the rights of the individual. As possible prosecution of offending officers and civil actions for damages against them seem to have no practical value, the courts, unfortunately, can do little to eliminate these evils; but what slight powers they have to do so they should vigorously exercise."[15b]

13a. See, e.g., Frank, If Men Were Angels (1942) 317–318.

14. Cf. Frank, Administration of Criminal Justice, 15 F.R.D. 95; Frank, If Men Were Angels (1942) 331; Hall, Police and Law In a Democratic Society, 28 Ind. L.J. (1953) 133, 134.

15. Chesterton, Tremendous Trifles (1909) 85–86.

15a. See Hall, Police and Law In a Democratic Society, 28 Ind.L.J. (1953) 133, 135, 145.

15b. See Radin, Pretense and Reality in Criminal Law, 4 Oregon State Bar Bulletin (1939) 134, 144–145, 146, 148:
"We cling to the belief that a man arrested or accused may stand mute if he wishes. The difference between our theory and our practice here is too well known to be much labored here. The rule against self-incrimination holds for respectable citizens, that is for us, citizens who can hire lawyers, who should be encouraged to hire lawyers. Does it hold for the ordinary man? Surely only when

Recently many outstanding Americans have been much concerned—and justifiably—with inroads on the constitutional privileges of persons questioned about subversive activities.[16] But concern with such problems, usually those of fairly

the police are well-disposed; because, if they are not, there is nothing the victim can effectively do about it. When he is not afraid to do anything at all, he is helpless because he simply will not be believed. Obviously the stories told about the third degree, which is the symbolic way of describing the rejection of the privilege against self-incrimination, are monstrously exaggerated. But they are true in part, in far too great a part. And we are inclined to condone the third degree or to attempt to ignore it, because the police, honest police, often tell us that they cannot quite get along without it. Why can't they get along without it? Simply because every-day experience tells us that one of the most effective ways of eliciting information about anything is to discuss it with the persons who have had, or may have had, anything to do with it. The accused is a person who may have had something to do with the crime. If he refuses to talk at all, we are often helpless, not merely in relation to knowing whether he is guilty, but in relation to any means of further investigation. Guilty or not guilty, he could give us clues. He refuses to. Therefore, say the police, in private to be sure, we call for rubber hose and direct torture. A common element in the third degree is keeping a man awake for forty-eight hours; that is a definite form of torture. The third degree is a shameful thing. It is shameful because it is cruelty practiced on helpless persons by powerful persons. It is doubly shameful because it is furtive; it is used and then officially denied, because we respectable citizens refuse to admit its existence, because we like to boast of an institution that rejects it.

"I have said, and I mean it, that the majority of us prefer to be on good terms rather than bad terms with our consciences. When we say we regard the right of habeas corpus and the right against self-incrimination as precious and valuable, we should like to mean what we say. And we do not like to feel that we mean 'good for us' but not good for a lower class that has no business to enjoy such fine things. Evidently we could do a drastic thing. We could abolish habeas corpus and the rule against self-incrimination for everybody. In that case we should not find these institutions in our way when we want to protect ourselves against criminals. We have no intention of doing that.

"But, if we are realists, pragmatists, actualists, we ought not to go on indefinitely divorcing our practice from our theory. We do not dare assert that a large number of our fellow citizens are not good enough to enjoy the benefits of habeas corpus and the rule against self-incrimination. However brutal and undemocratic, that assertion would have the merit of honesty. It seems to me that what we ought to do is to make up our minds about what we really want and how much we are ready to sacrifice for it. * * * We want protection. Against whom? It is easy to say, against the criminal. But how can we recognize him? * * * It is a matter that deserves careful study. But it is a hard study. Some of it has been made, but under the most adverse conditions and with the greatest discouragement on the part of lawyers. Lawyers are given to turning their eyes away from it and hoping impatiently that not too many members of their perfectly good profession will be tempted into the byways of these criminological frills and whatnot. And the general attitude is that we are getting along passibly as we are, and that the difficult problem * * * takes more time and effort and energy than it is worth.

"So long as we say in effect to the police: 'You may act like thugs as much as you like. You may use third-degree methods, the rubber hose, enforced waking, and worse, provided you do not do these things to people that can pay us a fee,' the police will leave our prospective clients alone and concern themselves only with those whom we do not desire as clients. Now it takes little intelligence to apply a rubber hose, to turn a calcium light full into the eyes of a person propped up on a little stool. If this is the job we assign to the police, we shall not get a very intelligent police. But if we decide to make our practice and our theory coincide, we shall first have to join forces with the police; and the kind of police with which we can cooperate will have to have, of course, some at least of our training."

16. See, e.g., Taylor, Grand Inquest (1955); Griswold, The Fifth Amendment Today (1955); Barth, Government By Investigation (1955); United States v. Ullmann, 2 Cir., 221 F.2d 760; cf. Stouffer, Communism, Conformity and Civil Liberties (1955).

prominent persons, should not blind one to the less dramatic, less publicized plight of humble inconspicuous men (like Caminito) when unconstitutionally victimized by officialdom. It will not do to say—as some do—that deep concern with such problems of the humble is the mark of an "old-fashioned liberal." For repeated and unredressed attacks on the constitutional liberties of the humble will tend to destroy the foundations supporting the constitutional liberties of everyone. The test of the moral quality of a civilization is its treatment of the weak and powerless.

Reversed.

CLARK, Chief Judge (concurring in the result).

Since the coercion here was so much more direct and extensive than that in Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948, I agree that we must reverse on the authority of that case. But however much I support in the abstract the severe criticisms of police methods voiced in the opinion, I do not believe it helpful so to stress them here in derogation of a great state court which has the primary responsibility for law administration in this community. Since no court really rejects altogether evidence by way of confession or from the informer, the question becomes one of degree; and I can respect the views of the state judges as rationally developed, even though I must disagree. Nor do I have basis for selectivity among law enforcement agencies or among forms of crimes in reaching the result or apportioning criticism. Therefore I prefer to limit myself to the facts here and eschew the more general admonitions.

I am led more readily to this caution because I doubt the utility for dignified or effective law enforcement of review and overturn by any federal judge of the reasoned conclusions reached by a whole hierarchy of state tribunals. We are properly charged with supervising the trials in the federal district courts, but our sphere of superintendence should not extend to state police activities; there

the state courts should have the burden, subject only to certiorari by the Supreme Court in the few cases where needed. Consequently the pending legislation to that end, drafted by a committee of the Judicial Conference of the United States and supported by the Conference of State Chief Justices, seems wise policy. Meanwhile, however, our duty in premises such as these is clear, and needs no particular amplification or embroidery.