THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ MARTÍNEZ FIGUEROA ET AL., Defendants and Appellants.

No. 16907. Decided November 5, 1962.

*Luis E. Gandía Argüelles* and *Enrique González* for appellants. *J. B. Fernández Badillo, Solicitor General,* and *Juan A. Faría, Assistant Solicitor General,* for The People.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

Mr. Justice Blanco Lugo delivered the opinion of the Court.

The district attorney filed an information against the five appellants charging them with the offense of rape, alleging that on May 14, 1956 they "unlawfully, wilfully, maliciously, acting in common concert, by the use of force, violence, intimidation, and against her will, lay and had sexual intercourse with R... R... R..., who was not there and then the defendants' wife." The trial having been held before a court without a jury, the prosecution introduced oral and documentary evidence—the latter consisting in the statements given by defendants in the course of the preliminary investigation. The defense submitted the case without introducing evidence, with the exception of that introduced in an attempt to establish the involuntariness of defendants' statements. They were found guilty and they appealed from the judgments rendered [1] assigning the commission of three errors.

 1. The first error challenges the admission in evidence of the written statements made by defendants, alleging that they had been given involuntarily and as a result of unlawful detention and arrest. It is necessary to make a brief summary of the evidence which the trial court had under consideration, but we will refer first to what was said in *People* v. *Fournier*, 77 P.R.R. 208, 276 (1954) : "We do not hold that a district attorney may not question a defendant, either before or after arrest, *for a reasonable time.* Undoubtedly, interrogation of both suspects and witnesses is of great social value in the apprehension and conviction of those guilty of serious crimes," as well as to *People* v. *Meléndez*, 80 P.R.R. 759, 772 (1958), where we cited with approval from the opinion delivered by Judge Jerome Frank in *United States ex rel. Caminito* v. *Murphy*, 222 F.2d 698, 701 (C.A.

---

[1] The court suspended the sentences to all the defendants with the exception of José Angel Meléndez Olivera. Section 2 of Act No. 103 of June 29, 1955, as amended, 34 L.P.R.A. § 1042 (1961 Supp.).

2, 1955), to the effect that "Alone or together, *neither the unlawful detention for many hours* nor the deceit in confronting Caminito with disguised police officers... *would suffice to vitiate the confession* as unconstitutionally obtained." (Italics ours.)

The evidence on this point established that the police received confidences in the sense that Pablo Morales Torres was connected with the facts of the case. According to his statement, he was on his way home for lunch—around 1:00 p.m.—when a police jeep patrolled by two uniformed officers stopped and they asked him to accompany them. He consented and was taken to police headquarters where he was questioned for about an hour, after which he admitted participation in the acts and identified the other four persons who were in his company that evening. Morales took the officers to the homes of the other appellants. Three of them were picked up in their homes or around San José housing project, while José Ángel Meléndez went in the evening to police headquarters with his father. Appellants offered no resistance, but according to the testimony of the officer who conducted the investigation, had they resisted, he would have used force to carry them. They arrived at the headquarters around 3:00 p.m. and were questioned by Sergeant Nazario. They were not ill-treated nor threatened. The parents of some of the defendants were present at headquarters, although not at the place where they were being questioned. They described their participation in the acts, and the district attorney was then called and he questioned each of the appellants separately after advising them that they did not have to testify and that everything which they might say could be used against them. They were given food. After reading the statements, they signed and handed them to the district attorney. The district attorney terminated the investigation around 10:00 p.m. and went out to submit the case to the judge.

The presiding judge determined that defendants, "when they were being investigated, were neither under arrest nor detention nor were deprived of their liberty in the sense contemplated in the law," and concluded that their appearance at headquarters was "voluntary." It is admitted that the agents did not have in their possession a warrant of arrest or subpoena when they procured appellants' appearance at headquarters.

■ Considering all the facts as a whole, and even admitting for the sake of argument that appellants were illegally detained [2] because the agents did not have a warrant of arrest and subpoena, all the circumstances point to the fact that their statements were voluntary and spontaneous, that the degree of physical or psychological coercion was not sufficient to taint with illegality, according to the holding in the cases of *Fournier* and *Meléndez, supra,* the facts of which are distinguishable, and in *People* v. *Caraballo,* No. 16634, per curiam decision of January 28, 1960.

2. In the discussion of the two remaining errors—dismissal of the motion for peremptory acquittal of defendants and that the judgments rendered are contrary to law and to the facts of the case—it is necessary to sum up the testimony of the prosecutrix.[3] This testimony is summed up in the brief of the Solicitor General as follows:

"[S]he has lived in concubinage with R.... G.... V... during two and one-half years. On May 14, 1956 she came out of Manuel A. Pérez housing project in the company of her paramour and headed for San Juan, but they had to return

---

[2] *Cf. McNabb* v. *United States,* 318 U.S. 332 (1943); *United States* v. *Mitchell,* 322 U.S. 65 (1944); *Upshaw* v. *United States,* 335 U.S. 410 (1948); *United States* v. *Carignan,* 342 U.S. 36 (1951); *Mallory* v. *United States,* 354 U.S. 449 (1957). See Rule 5(c) of the Federal Rules of Criminal Procedure.

[3] The only other prosecution witness was Dr. Arsenio Comas, who examined the prosecutrix 10 days after the occurrence. For some unexplained reason the testimony of the prosecutrix's paramour was waived as being cumulative evidence, and only the confessions made by defendants were used to corroborate the victim.

because the car broke down on the way. On their way back and as they rounded the curve to enter the project, the car stopped. Her paramour got out to see what was wrong with the motor after having asked her for soap and a key. When he finished and as he was about to lower the hood of the car, defendants jumped on him. When she heard her paramour say ¡ay!, she looked and saw them on him. She was quick, stood between them and grabbed the tallest one by the neck. At the same time she told him not to beat her husband, she asked them if they wanted money, and they answered that they did not want money, that they wanted her. Defendants continued to threaten her paramour. One of them threatened him with a knife, the short one with a club, and the other one with the fist. She then yelled not to do anything to him, that she begged them for her sake to leave him, but they did not yield despite her entreaty. Then, since they continued to threaten him, she said: 'Don't do anything to him, I will give in to you.' When they heard this, one of them said, 'Well, hold him.' While defendants held him, one of them said to her: 'And you, come over here,' and grabbed her. They put him in the front seat of the car, and one of them threatened him with a knife and another with a club. In the meantime another one came over to her and carried her on her back to the back part, pushed and threw her on the back seat, took down her panties, and had sexual intercourse with her. In the meantime the others asked the one who was with her, 'Are you through?', and the latter said to the other, 'Yes, I finished.' The one who was with her would come right away to where her paramour was and held him while the other would go to her and engage in sexual intercourse. All of them had sexual intercourse with her only once. After they finished, they let the paramour go and freed her. All of them then stood up straight and said to her and to her paramour: 'Now start the car and get out if you want to.' While all of the foregoing was taking place, she noticed that her paramour had a sort of stroke because he has heart trouble. For that reason she had to wait until he recovered. When he tried to protect her, they said to her: 'Keep still if you don't want anything to happen to your husband.' At that moment defendants did not seem like human beings, but looked like beasts. She had not met any of them before that. After the occurrence, when her paramour felt better, they went to police headquarters in Río Piedras and

there they spoke to Lieutenant Rivera. Then they got in the police wagon with Lieutenant Rivera and went to make a round to see if they could find any of the defendants. She did not see their faces during the occurrence because they were covered with handkerchiefs. They admitted this to the police after they were taken to headquarters. They also admitted there that they had sexual intercourse with her. She did not let any of them inflict any harm to her paramour during the incident. While one of them had sexual intercourse with her, her paramour said to all of them: 'For goodness sake, you are men, don't abuse my wife like that,' and she yelled to him, 'Don't speak, R. . . they will kill you.' (Tr. Ev. 18–27.) On cross-examination . . . she said that everything occurred between 7:00 and 7:30 p.m. They threatened her paramour, not her, with the knife. That night she suffered a lot because she did not want anything to happen to R. . . and she also said that she, too, might be in danger because they did not act like human beings, but rather like beasts. She had not had any beer. It was to them that she yelled and cried. She did not cry for help because of the threats. No one came because there was no one around. She was so 'scared' that she did not dare open her mouth either. The defendants jumped violently, impetuously, on her husband, as if to take his wife away from him. They held him like a man which he was, in order to subdue him. The tallest one said to him: 'Keep still,' and raised the club with the right hand while he held him with the left. He did not strike him because she was quick to act. The one with the knife also said to her paramour to keep still. The defendants removed the handkerchiefs from their faces after the brutal act and right away said to her and to her paramour to get out. Then they left running. The one with the knife did not touch her paramour, but pointed it at his chest saying: 'Keep still.' All of them told him to keep still. She held on to the one with the knife and to the one with the club so they would not do anything to her husband. R. . . (the paramour) did not scream because he got sick immediately. They did not cut R. . ., nor cudgelled him, nor beat him with the club, and did not even produce a scratch because she would not let them, notwithstanding she risked her life. The only thing which one of them did to her was to tighten her throat so as to compel her to kiss him. While one of them had sexual intercourse with her, another grabbed her by the throat and said to her:

'If you want your husband to come out unharmed, keep still.' No one was armed in front of the door of the car where she was seated so as to prevent her from getting out when they arrived. She got out by that door, but she thought the defendants were going to do something to her paramour and she expected the worse because of the manner in which they were behaving there. The roof caved in. They did not injure nor slapped her, nor beat her with the club. She was crying and screaming because actually they did not want money, they wanted her, and she surrendered so they would not do anything to her paramour. She did not yield of her own will. She did it for her husband's sake, because she was scared amidst those beasts. She then said, 'Even you would do it to save someone of your family.' She was not going to stand idle waiting for them to beat him. She begged and begged and cried, and since they would not listen she had to surrender. She did not strike the one she grabbed by the neck because she thought that out of compassion they would not do what they did. She did not lie down in the seat of the car. They were the ones who laid her down. She thought that by giving in she would not run further risk. The one who laid her down did not have anything in his hands. He grabbed her by the shoulders and pushed her abruptly and she fell flat in the car and he then jumped on her. She tried to bite him, but she recalls that someone grabbed her by the neck so she would kiss him. She was not engaged in sexual intercourse with her paramour when defendants arrived because he was fixing the car and he could not do both things at the same time. She had passed her menstruation three days ago, but was prepared just in case. While one of them was having sexual intercourse with her, another asked him: 'Are you through?, and the other answered, 'not yet,' and the other then asked him to let him know. When one finished he would say to the other, 'Come, I'm through,' and then as soon as the other came the one who had finished went over to where her paramour was. While that was going on she did not scream because she was afraid and thought that by giving in they would not harm her paramour. They put R... by force in the front seat of the car. The one with the knife was nearest to him although he was not sitting in the car. They were alone with him pointing at him so he would not move, and they were together. Those who were standing by the side of the car would not let him open the door. He said to all of

them not to abuse because he was seeing what they were doing to her while she was lying down. But she watched that they would not harm him, because when people like that decide to commit an outrage they are apt to do anything. She did not run toward the nearby buildings because they surrounded her paramour so quickly that she thought that if she ran they would beat him. She cried, but yielded out of fear because she thought that she would save his life if she did not scream. On cross-examination by the district attorney (Tr. Ev. 104), she said that she had a girl by R... and that they lived and slept in her brother's house in Manuel A. Pérez housing project."

In the assignment of errors appellants maintain that the information charges them with the offense of rape under subd. 4 of § 255 of the Penal Code, 1937 ed., 33 L.P.R.A. § 961, consisting in having intercourse with a female other than the wife when the victim resists but is overcome by force or violence; that intimidation is not an integral element of this modality nor of any of the others mentioned in that section; and that even if it were understood that the information charges the modality referred to in subd. 3—where the female is prevented from resisting by threats and immediate bodily harm, accompanied by apparent power of execution—the evidence in such case would be insufficient, since it was only established that the victim surrendered so that no bodily harm would be done to her paramour, without at any time having been beaten, forced, or threatened personally.

Before disposing of this assignment we wish to clarify a statement appearing in the brief of the Solicitor General which briefly states that, inasmuch as § 255 of the Penal Code refers to only one offense, the fact that the information is made under a mistaken modality is immaterial. He invokes *People* v. *Tollack*, 233 P.2d 121 (Cal. 1951); *People* v. *Blankenship*, 228 P.2d 835 (Cal. 1951); *People* v. *Cassandras*, 188 P.2d 546 (Cal. 1948), where it was said at p. 549 that "It is well settled that, regardless of the subsection al-

leged, if the proof brings the case within any of the subsections of § 261, the offense of rape has been successfully proved by the prosecution"; *People* v. *Vann*, 61 Pac. 776 (Cal. 1900); and *People* v. *Snyder*, 17 Pac. 208 (Cal. 1888). In fact, that was the prevailing doctrine in that state from which our Penal Code was taken, and it was thus explained in the section corresponding to variance between the information and the evidence in 42 Cal. Jur. 2d Rape, § 46: "Any variance between an information charging the defendant with having accomplished rape in a particular manner defined in the Penal Code section defining the crime and proof that the act was accomplished in any other manner defined in that section is immaterial, and does not prejudice the accused. In other words, whatever subdivision of the Penal Code section defining rape is alleged in the information, if the evidence brings the case within any one of the several subdivisions the offense of rape is established." However, this doctrine was substantially modified in *People* v. *Collins*, 351 P.2d 326 (Cal. 1960), in stating that evidence on a modality other than that charged was not admissible unless the defendant before the trial—evidently referring to the preliminary hearing—has received notice of the possibility of such a variance, and thus avoid being taken by surprise. The cases cited by the Solicitor General as well as those of *People* v. *Mummert*, 135 P.2d 665 (Cal. 1943), and *People* v. *Jailles*, 79 Pac. 965 (Cal. 1905), are expressly repealed.

■■ However, this fact in no way affects the decision of the instant case since, as contended by the Solicitor General, since 1907 in deciding *People* v. *Rodríguez*, 12 P.R.R. 176, we said, relying on *People* v. *Pacheco*, 70 Cal. 473, 11 Pac. 761 (1886), that an information for rape which alleges that the act was committed with force and violence and against the will and consent of the female, is equivalent to a statement that she resisted, but that her resistance was overcome by violence, *or that she was prevented from resist-*

*ing by threats of immediate and great bodily harm, accompanied by apparent power of execution.* The *Pacheco* case has not been altered or modified, and the doctrine established therein prevails in California and has been cited with approval in *Harmon* v. *Territory*, 49 Pac. 55 (Okla. 1897), and *State* v. *Delvecchio*, 69 Pac. 58 (Utah 1902). Having examined the information filed in the instant case, and applying the holding in *People* v. *Rodríguez, supra,* it is clear that defendants were charged with having committed the offense of rape, under any of the modalities mentioned in subds. 3 and 4 of § 255 of the Penal Code. *Cf. People* v. *Colón,* 81 P.R.R. 788, 793 *in fine* (1960).

From the summary of the prosecutrix's testimony it appears that the evidence does not support the conclusion that she offered physical resistance, but that it was overcome by force or violence.[4] However, is it sufficient to fit it within the modality which consists in the victim's inability to offer resistance because of threats of grave and immediate bodily harm, accompanied by apparent power of execution? In this connection, it is well to recall that the evidence establishes that defendants threatened the aggrieved party's paramour—the assailants held him so he could not move, one of them with a club and another pointing a knife at him, while each one of them, in successive order, satisfied his lustful desires—and that the prosecutrix "tired of begging and crying" yielded only to prevent harm to her "husband." She added that "I did not yield of my own will, I did it for my husband's sake, because I was scared amidst those beasts; even you would do it to save someone of your family." (Tr. Ev. 84.)

 In *People* v. *Vega,* 20 P.R.R. 283 (1914), we said that the crime of rape consists essentially in the outrage in-

---

[4] The prosecutrix testified that the first defendant who had sexual intercourse with her "pushed her abruptly" to the back seat of the car and that another grabbed her by the throat "to compel her to kiss him." However, it appears clearly that she yielded for fear that they would harm her companion.

flicted upon the person and feelings of the woman and always involves the absence of her consent. *People* v. *Oquendo*, 83 P.R.R. 227 (1961) ; *People* v. *Colón*, 81 P.R.R. 788 (1960). We have no doubt at all that the prosecutrix in this case did not consent of her own will to the execution of the carnal act, since she surrendered to defendants out of fear which they instilled in her. The absence of resistance may be explained by the threats proferred by the assailants against her paramour and the apparent attitude to carry them out. The picture of the facts as a whole shows without doubt that the prosecutrix feared for her personal security as a result of the threats and attitude of defendants who instilled fright in her. "They looked like beasts," is the phrase which characterizes graphically appellants' behavior.

 Although the word intimidation is not expressly used in the statute and, therefore, the fact that it was included in the information should be deemed superfluous, this concept should be deemed to be comprised within that of threats referred to in subd. 3, since, as stated in PERKINS, Criminal Law (The Foundation Press, 1957) at p. 122, "the differences [he refers to the concepts of force, fear, fright, or intimidation], however, are matters of form rather than substance." And as to whether fright or fear may be caused by threats toward a person who has certain personal relations with the victim, and that such fear is deemed to be instilled in the victim herself, see *People* v. *Macchiaroli*, 202 Pac. 474 (Cal. 1921), *People* v. *Winters*, 329 P.2d 743 (1958) ; *Hazel* v. *State*, 157 A.2d 922 (Md. 1960).[5] The reference to *Darrell* v. *Commonwealth*, 88 S.W. 1060 (Ky. 1905), in the brief for

---

[5] PUIG PEÑA, in his work *Derecho Penal*, Vol. IV, p. 33 (5th ed. 1960), in referring to the offense of rape according to the Spanish Penal Code, comments that "Regarding intimidation, the doctrine is unanimous in admitting the same not only in the case of material intimidation (threat with a pistol), but also of intimidation properly moral (threat of serious harm [citation] or intensive psychological coercion . . . and not only when it is exerted on the person sought to be subdued, but, unlike physical force, it may be employed also against a third party..."

appellants is clearly inapplicable, since it refers to threats toward the prosecutrix's father *after* the carnal act was completed. 2 BURDICK, Law of Crime, § 483, does not support either appellants' theory, for although it is stated that "Threats, however, in order to amount to constructive force must be of serious bodily injury to the woman herself," this citation can not be read out of the following text to the effect that "A threat to put her out of a car and to compel her to walk home, or to arrest her (made by one impersonating a policeman), is not sufficient to constitute rape through fear, and threats made after the act to prevent the woman from disclosing it to another do not amount to force."

The errors assigned not having been committed, the judgments rendered by the Superior Court, Bayamón Part, on September 4, 1958 will be affirmed.