270 F.2d 513
 UNITED STATES of America ex rel. Joseph CORBO, Relator-Appellant,
v.
J. Edwin LA VALLEE,* Warden, Clinton Prison, and
the People of the State of New York, Appellees.
 No. 272, Docket 25365.
 United States Court of Appeals Second Circuit.
 Argued June 1, 1959.
Decided Sept. 29, 1959.
 
 M. Bernard Aidinoff, New York City (Jeffrey A. Fillman, New York City, on the brief), for relator-appellant.
 Irving Anolik, Asst. Dist. Atty., Bronx County, New York City (Louis J. Lefkowitz, Atty. Gen., Paxton Blair, Solicitor General, Albany, N.Y., Daniel V. Sullivan, Dist. Atty., Bronx County, Walter E. Dillon, Asst. Dist. Atty., New York City, and George K. Bernstein, Asst. Atty. Gen., on the brief), for appellees.
 Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 Relator appeals from the denial, without a hearing, of his petition for a writ of habeas corpus. He seeks to set aside his 1951 conviction for first degree murder in Bronx County, New York, on the ground that statements and admissions that he made after his arrest and prior to his arraignment, which were admitted into evidence at his trial, were coerced in violation of due process of law guaranteed by the Fourteenth Amendment.
 
 
 2
 The constitutional validity of the conviction depends solely on whether or not the statements and admissions were made voluntarily. The Supreme Court's decisions in Payne v. Arkansas, 1958, 356 U.S. 560, 567-568, 78 S.Ct. 844, 2 L.Ed.2d 975, and Spano v. New York, 1959, 360 U.S. 315, 324, 79 S.Ct. 1202, 3 L.Ed.2d 1265, establish that if the statements and admissions were coerced the writ must issue regardless of whether there was ample other evidence, apart from the statements and admissions, to support the jury's verdict.
 
 
 3
 The district judge denied the writ on the ground that the undisputed evidence did not support the claim of coercion and because he found sufficient other evidence aside from the allegedly coerced statements to support Corbo's conviction. It was error to rest the denial of the writ upon the presence of sufficient other evidence. Payne v. Arkansas, supra; Spano v. New York, supra.
 
 
 4
 We therefore find it necessary to review the state court record to determine whether the undisputed evidence supports Corbo's claim of coercion. Both parties have relied exclusively on the state trial record and that was all that the district judge was asked to consider. We have examined this record and after a consideration of all the undisputed evidence we are left with a firm and clear conviction that Corbo's statements and admissions were coerced in violation of due process of law. Accordingly, we reverse the order of the district court and direct that the writ issue.
 
 
 5
 In June 1951 Joseph Corbo and Rudolph Santobello were convicted of first degree murder for the killing on July 21, 1950 of Alfred Loreto, an off-duty policeman. The state proceeded to trial on the theory that the homicide was committed while the defendants were in the course of the commission of the felony of attempted larceny, the taking of Loreto's car.[1]
 
 
 6
 At trial certain statements and alleged admissions given by the defendants were admitted into evidence over the repeated objections of defense counsel that they were the result of police coercion. The trial judge overruled all objections and left it to the jury to decide whether the statements were voluntary. He charged the jury that, if they had a reasonable doubt whether the defendants made the statements as the result of fear produced by beatings or threats, it was their duty to reject the statements and not to consider them as evidence. The trial judge did not charge the jury that if they found that the statements were involuntary they could not convict. The jury returned a general verdict of guilty, recommended mercy and both defendants were sentenced to life imprisonment.
 
 
 7
 On appeal the Appellate Division unanimously affirmed both convictions in a per curiam opinion. The court did not decide the claims of coercion as it found ample evidence to sustain the convictions aside from the alleged involuntary confessions of both defendants. 1953, 284 App.Div. 273, 131 N.Y.S.2d 540. The Court of Appeals affirmed, without opinion, unanimously as to Corbo, but with two judges dissenting as to Santobello. 1954, 307 N.Y. 928, 123 N.E.2d 574. Certiorari was thereafter denied. 1955, 348 U.S. 977, 75 S.Ct. 543, 99 L.Ed. 761.
 
 
 8
 In June 1958 Corbo filed a petition for a writ of habeas corpus in the Northern District of New York. Judge Brennan considered the petition on the record of the state court trial and on June 16, 1958 denied the petition without a hearing. He held that although it was not possible to tell whether the jury had accepted or rejected the disputed statements of the petitioner, his review of the petitioner's constitutional claim must nevertheless be limited to the undisputed facts. He found that such facts did not support petitioner's claim of coercion.
 
 
 9
 It is well established that, regardless of a finding of voluntariness, by jury or by judge in a state proceeding, it is the duty of the federal court in considering a petition for a writ of habeas corpus to make its own independent determination of whether the confession was voluntary. Thomas v. Arizona, 1958, 356 U.S. 390, 393, 78 S.Ct. 885, 2 L.Ed.2d 863; Brown v. Allen, 1953, 344 U.S. 443, 507-508, 73 S.Ct. 397, 97 L.Ed. 469; Stein v. New York, 1953, 346 U.S. 156, 182, 73 S.Ct. 1077, 97 L.Ed. 1522; United States ex rel. Wade v. Jackson, 2 Cir., 1958, 256 F.2d 7, 9. The undisputed facts upon which rests the determination of whether Corbo's statements and admissions were voluntary, are as follows.
 
 The Events of July 21-22, 1950
 A. The Homicide
 
 10
 At 7:45 P.M. on July 21, 1950, Ralph Sgueglia, a butcher, after making some deliveries, arrived at his home at 1841 Hering Avenue in his Buick car. When he stopped his car the two defendants, Corbo and Santobello, were waiting on the sidewalk. The two men got into the front seat of the Buick, Santobello on the driver's side, and Corbo on the passenger side, pushing Sgueglia in between them, and Santobello drove the car away. Sgueglia resisted as best he could, attempted to stop the car, grabbed the wheel and sounded the horn. While Santobello drove, Corbo struck Sgueglia over the head with a revolver and threatened to shoot him. Although he was dazed and splattered with blood, Sgueglia wrested the pistol from Corbo and struck him with it.
 
 
 11
 The erratic movements of the Buick attacted the attention of Alfred Loreto, an off-duty policeman, who lived down the street, and he followed in his green Dodge. The Sgueglia Buick went two blocks, mounted the curb and stopped. Corbo and Santobello both got out and ran back toward Loreto's Dodge. Corbo opened the door of the car and started to get in and shortly afterwards a second gun which he was carrying was discharged and Loreto staggered out of his car and died. Corbo and Santobello ran away through a vacant lot. Several eyewitnesses witnesses had seen them and it was known that one of them had brandished a gun.
 
 B. The Arrest and Interrogation of Corbo
 
 12
 The police were alerted and immediately scoured the neighborhood. Two eyewitnesses had driven after the two men and they were able to advise the police patrol cars approximately where the assailants could be found. Within a short time Corbo was found sitting on a stoop a few blocks away from the shooting and he was taken to the 43rd Precinct Station House for questioning where he arrived at about 8:15 P.M. Santobello was stopped about ten blocks away from the shooting by two other officers and was also taken to the station house.
 
 
 13
 Corbo and Santobello were not booked when they were brought to the precinct station but were taken upstairs to the detective offices for questioning. The police dragnet soon crowded the station house with possible witnesses, police and newsmen, with some 40 or 50 persons clustered in the detectives' offices where Corbo and Santobello were brought. In the early morning hours, the Mayor and the Police Commissioner visited the station house.
 
 
 14
 Some time after his arrival at the station house, Corbo asked permission to call his wife in order to obtain the name of a lawyer. A policeman called Corbo's wife and obtained the name and address of a lawyer, one Harold Robbins. It does not appear, however, whether the police contacted Robbins.
 
 
 15
 After questioning four eyewitnesses to the abduction, shooting and flight, the district attorney and the police soon evolved the theory that Corbo and Santobello, upon fleeing the Sgueglia car, had decided to take the Dodge which had been following them, and in the course of this attempted larceny, Loreto had been killed. Under this theory, the defendants would be guilty of felony murder for which they might pay with their lives.[2] There was much initial confusion, however, among the eyewitnesses on various points, including the identity of the actual gunman, as Corbo and Santobello had both been wearing blue garments.
 
 
 16
 After about four hours of questioning by the police, Corbo was interrogated at 12:10 A.M. by an assistant district attorney in the presence of a stenographer. In this statement Corbo admitted that he and Santobello had forced their way into Sgueglia's car, that he, Corbo, had hit Sgueglia with a gun, that the car went out of control, and that when it ran up on the sidewalk and stopped they got out and ran away. Corbo identified the gun which Sgueglia had taken away from him and he said that the gun had then been empty. In this statement, however, he did not admit to any complicity in the shooting of Loreto. He denied seeing a green car or any car following Sgueglia's car and hearing any shots. The statement was completed at 12:30 A.M.
 
 
 17
 From the completion of Corbo's statement at 12:30 A.M. until 5:00 A.M., the record is completely barren of any of the details surrounding the detention and interrogation of Corbo. At 5:00 A.M. Jacques Buitenkant, Corbo's counsel at the trial, appeared at the station house and asked to see Corbo, but he was excluded and put out of the station house.
 
 
 18
 Some time after 5:30 A.M., Corbo according to his own testimony, volunteered to retrace his flight for the police and thereby assist them in finding the death gun. Corbo led the police to the vacant lot where he thought he might have thrown the gun. A dozen police commenced the search shortly after daybreak, about 6:30 A.M., and at 6:45 A.M. the gun was found in some underbrush.
 
 
 19
 Detective William O'Brien testified that after the gun had been found in the vacant lot and while Corbo was handcuffed to Patrolman Walsh, Corbo admitted to O'Brien that he went back to the car to steal it in order to make a getaway, that he and Santobello both thought of this at the same time, and that he went to the right side of the car and Santobello went to the left, that he, Corbo, then got in. When asked why he shot Loreto, O'Brien said that Corbo answered, 'I don't know, the gun just went off.' O'Brien never made any notes of these admissions. Patrolman Walsh was not called to confirm O'Brien's testimony. O'Brien further testified that after this he returned to the station house and told Santobello that Corbo had told the whole story and that Santobello might as well tell the truth, whereupon Santobello told him substantially the same story as Corbo.
 
 
 20
 At 7:15 A.M. Corbo was booked. At 9:15 A.M. the assistant district attorney took a second stenographic statement from Corbo who admitted that he had had a gun in his hand and that it may have had a bullet in it. Asked in a double question about Loreto's green car, 'Did you go to a green car to take that to get away? Do you want to answer that question?' Corbo answered, 'I guess so.' The statement was completed at 9:30 A.M. and Corbo was not questioned further.
 
 
 21
 At 1:30 P.M. Corbo was arraigned before a magistrate. We take notice of the fact, however, that he could not have been arraigned prior to 10:00 A.M. on July 22 as the New York City Magistrates Courts are not open at night for felony arraignments.[3] Corbo was thus questioned by the police over a thirteen hour period, from 8:15 P.M. on July 21 until 9:30 A.M. on July 22, all of which was prior to the earliest time at which he might have been arraigned. The record does not indicate whether he was questioned continuously throughout this period or whether he was left alone at various times. A police officer testified that while he was present someone was almost always questioning Corbo, but it does not appear how often during the night he was actually present at the questioning of Corbo. Corbo testified that he was interrogated all night long and that he was left alone at one point for two or three hours. From about 5:30 A.M. until nearly 7:00 A.M. Corbo was engaged in aiding the police to find the death gun.
 
 
 22
 In any event, during the period of investigating a crime, the police must have the power to detain suspects for reasonable periods of time in order to question them, check their stories, and to run down leads which either confirm or contradict those stories. Cf. Spano v. New York, supra; United States ex rel. Wade v. Jackson, supra, 256 F.2d at page 15. Here, the police were investigating the commission of a homicide. They were confronted with witnesses who differed on essential details including the identity of the gunman. The death weapon itself was not found until 6:45 A.M.
 
 
 23
 But there are additional undisputed facts which materially alter the complexion of Corbo's disputed claim that he was coerced into giving the two stenographic statements and the oral admission to Detective O'Brien. These facts relate primarily to the treatment of Santobello at the hands of the police.
 
 
 24
 Corbo and Santobello were questioned at the same time and place about the same killing. The detectives' quarters at the 43rd Precinct House consisted of four rooms on the second floor. The first room to be entered was a large room known as the detectives' squad room, to the right was the lieutenant's room, about thirty feet by ten feet. Alongside the squad room was the detectives' dormitory and on the left side was a record and stationery room which had no window. In these rooms Corbo and Santobello spent all their time from 8:15 P.M. until sometime late the next morning, except when Corbo was taken out around 6:00 A.M. during the search for the gun. At different times Corbo was in the large squad room or in the lieutenant's room or in the stationery closet. He and Santobello were kept in separate rooms most of the time. But they were seen in the same room by Patrolman Walsh, and they obviously saw one another when they were transferred at the same time from room to room which occurred on several occasions. It seems very unlikely that in such an area, with people coming and going and doors opening and closing, any continued mistreatment of one prisoner could remain unknown to the other. The manner, therefore, in which the police treated Santobello sheds light on the circumstances under which Corbo was questioned and on the voluntariness of any statement he made.
 
 Santobello's Treatment
 
 25
 Santobello testified that he was brought to the station house and was interrogated all night. He said that shortly after he arrived at the station house he was asked by several officers where the death gun was and that they beat him when he said he never had a gun. He claims that they hit him on the head with their guns and dazed him with a blow on the nose with a billy.
 
 
 26
 At 12:45 A.M. the district attorney took the first statement from Santobello who denied having had a gun. In this statement Santobello denied knowledge of the events in connection with the shooting of Loreto but admitted hearing one or two shots as he was fleeing from the Sgueglia car. He testified that later he was kicked, beaten with a rubber hose and hit across the shins with a baton and that this continued for three or four hours. After the police returned from the search for the gun, which was found in the vacant lot at 6:45 A.M., Detective O'Brien questioned Santobello and obtained a vital admission regarding Santobello's intention of stealing the Loreto car. Santobello claimed that O'Brien beat him with a rubber hose and threatened to kill him unless he admitted that he had intended to steal the car.
 
 
 27
 After this the assistant district attorney took a second statement at 9:28 A.M. Santobello said this statement was given out of fear of further punishment. It was in this statement that Santobello gave this incriminating answer to a question about the Dodge car:
 
 
 28
 'Q. You went back to take this Dodge to get away? A. Yes, when I see him half in and half out, I ran.'
 
 
 29
 After this second statement was taken, Santobello was photographed and finally arraigned in the Magistrate's Court at about 1:30 P.M. of July 22.
 
 
 30
 The evidence adduced by Santobello and undisputed, leaves no room for doubt that he was badly beaten at some time prior to his arraignment. The Police Department black and white photograph, Exhibit G, taken on July 22, shows noticeable discoloration and swelling especially around the left eye. Patrick McMahon, an attorney who had witnessed the shooting, testified that when he saw Santobello in the station house at about 11:00 P.M. one of Santobello's eyes was discolored and puffed up.
 
 
 31
 Most of the police witnesses admitted noticing Santobello's black eye or marks on his face at the station house. Detective John Kelly who picked up Santobello shortly before 8:00 P.M. first noticed around 9:30 P.M. that Santobello's eyes were discolored and that he had swelling about his eyes. Arthur Salmore, a stenographer in attendance that night, also noticed Santobello's blackened eyes. Edward Sullivan, the correction officer on duty in the Magistrate's Court, noticed at Santobello's arraignment on the 22nd that both eyes were discolored. He made a note of this and also that Santobello complained of dizziness.[4] Otto Fusco, then Santobello's attorney, noted that his two eyes were black and blue and both his cheeks were bruised. The same day, or a few days later, Fusco saw big bruises on his chest and black and yellow bruises on both legs from his ankles to his knees. Either that day or two days later, Fusco complained to the Magistrate, in the presence of the district attorney, and asked that a doctor be sent to examine Santobello. According to John McPhelan, a contemporaneous inmate of the jail, on July 22 Santobello's shoulders and arms were very badly bruised. Dr. Contino, the prison physician, finally examined Santobello on July 25 and noted two black eyes and pain in the left side of the chest. On August 7 the doctor reported him suffering from 'pain in the front left side of chest with expectoration of blood' and he diagnosed this as possible fracture of a rib.
 
 
 32
 The police testified that Santobello resisted arrest and that reasonable force was necessary to subdue him. Based upon this testimony, police denials of beatings in the station house, and the circumstances of the original struggle in the Sgueglia car, the state claimed that Santobello's bruises were not the result of police brutality.
 
 
 33
 Patrolman Daum testified that while he was frisking Santobello for a weapon, Santobello grabbed him and he in turn struck Santobello with his baton. Daum also testified that his partner, Patrolman Loewy, then rushed up and put his revolver in Santobello's ribs. Santobello denied that any scuffle took place between himself and Daum and Loewy.
 
 
 34
 The evidence concerning the struggle in the car between Corbo, Santobello and Sgueglia is not entirely clear but it indicates that most of the fighting took place between Corbo and Sgueglia as Santobello was driving the car.
 
 
 35
 We do not attempt to resolve the conflicting testimony as to whether or not there was force used to subdue Santobello at the time of his being taken into custody. Even accepting the police testimony as true, this, together with the scuffle in the Sgueglia car is inadequate to explain how Santobello came to be covered from head to toe with bruises after sixteen hours of uninterrupted police custody. A federal court is not bound to accept the conclusions or theories which either party advances as flowing from undisputed facts. We are not persuaded by the state's argument that bruises of the nature we have described could have resulted from anything other than police misconduct in the station house.
 
 Corbo's Treatment
 
 36
 Corbo claimed that shortly after his arrival at the station house he was beaten repeatedly by police officers, particularly by Detectives William O'Brien and John Kelly who flailed him with a rubber hose, and, striking him with a pair of brass handcuffs, knocked out two of his front teeth. Corbo also asserted that through an open door, he saw two detectives beat up Santobello and that after the police closed the door he heard shouts. The police claimed, as with Santobello, that any injuries suffered by Corbo were inflicted either in Corbo's struggle with Sgueglia or by the police when they arrested Corbo. Sergeant McLaughlin, one of the officers who arrested Corbo, said that when Corbo made a sudden move as if to run away, he struck him several times on the lower part of the back and that Officer Walsh also hit Corbo 'maybe once, maybe twice, maybe three times.' Walsh testified that he hit Corbo only once. Corbo denied that either of these officers struck him when they arrested him.
 
 
 37
 This, together with the testimony regarding the violence of the earlier struggle between Corbo and Sgueglia might be sufficient to explain away Corbo's claims of injury and justify our concluding that Corbo's injuries were not inflicted during the period of police detention. Here, however, we need not decide whether or not direct physical force was brought to bear on Corbo after he arrived at the police station.
 
 
 38
 The Constitution does not safeguard one from physical abuse alone and coercion may take many forms. See, Spano v. New York, supra; Leyra v. Denno, 1954, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948. Here the conclusion is inescapable that Corbo knew from what he had seen and heard that the police had beaten Santobello. The two were questioned in such close proximity that Corbo must have been aware of the physical punishment which it is clear the police inflicted on Santobello. Such direct physical intimidation of Corbo's companion could only have the effect of inducing in Corbo grave fear for his own personal safety, particularly, if, as the police claim, Corbo was forcibly subdued when first taken into custody by the police.
 
 
 39
 In view of the undisputed evidence of the length of Corbo's detention, the exclusion of his counsel, and his knowledge of the brutal treatment accorded Santobello, we must conclude that Corbo was placed in such fear that his statements and admissions were involuntary. It follows that Corbo's conviction, after a trial in which these statements were placed before the jury, is in violation of his constitutional right to due process, Payne v. Arkansas, supra, and the writ must issue.
 
 
 40
 We note that M. Bernard Aidinoff and Jeffrey A. Fillman as assigned counsel have ably and zealously represented the relator and we commend the manner and the spirit in which they have rendered their services.
 
 
 41
 Reversed with instructions to issue the writ of habeas corpus.
 
 
 
 *The court has substituted J. Edwin LaVallee for J. Vernal Jackson, who until his death was Warden of the Clinton Prison and was originally named as defendant in this action. See Rule 25(a), (d), Federal Rules of Civil Procedure, 28 U.S.C.A.
 
 
 [1]
 New York Penal Law 1044(2) is the felony-murder statute. An attempt to commit larceny of property worth more than $100 is a felony under the laws of New York, see New York Penal Law 2, 261, 1296 and 1297. There was evidence that Loreto's Dodge car was worth over $1,000
 
 
 [2]
 Corbo claimed that he thought Loreto's car had belonged to a confederate and that when he attempted to enter the Dodge, Loreto grabbed him and in the struggle, his gun accidentally went off, killing Loreto. At trial and on appeal, Corbo's counsel urged that he was guilty, at the most, of manslaughter first degree, the maximum penalty for which is 20 years imprisonment. See, New York Penal Law 1051. The prosecution expressly waived any felony which may have been committed in connection with the abduction and assault of Sgueglia as a basis for a charge of felony murder
 
 
 [3]
 The night court in New York City is open only for the arraignment of those charged with misdemeanors and offenses. New York City Criminal Courts Act 106, 109
 
 
 [4]
 While the notation 'complains of dizziness' was excluded by the trial judge, this exclusion seems to have been error. People v. Alex, 1933, 260 N.Y. 425, 183 N.E. 906, 85 A.L.R. 939