**UNITED STATES ex rel. Harold D. ROGERS, Relator-Appellant,**

v.

**Mark S. RICHMOND, Respondent-Appellee.**

**No. 261, Docket 25465.**

United States Court of Appeals Second Circuit.

Argued April 13, 1959.

Decided Oct. 28, 1959.

Clark, Chief Judge, dissented.

**366**

------♦------

Louis H. Pollak, New Haven, Conn. and Jacob D. Zeldes, Bridgeport, Conn., for appellant.

Abraham S. Ullman, State's Atty., Arthur T. Gorman, Asst. State's Atty., New Haven, Conn., and Robert C. Zampano, East Haven, Conn., for respondent.

Before CLARK, Chief Judge, and SWAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

In May of 1954 the relator was convicted in a state court in Connecticut of murder committed during the perpetration of a robbery. He was sentenced to death. In his trial two confessions by him were put in evidence over objection that they were induced by coercion. The trial judge after hearing evidence in the absence of the jury found the confessions voluntary and admissible.* The conviction was affirmed by the Supreme Court of Errors, one judge dissenting. State v. Rogers, 143 Conn. 167, 120 A.2d 409, certiorari denied 351 U.S. 952, 76 S.Ct.

---

\* In Connecticut the facts relating to the charge of coercion in obtaining a confession are developed before the judge. Upon these historical facts, he passes upon the admissibility. If found to be voluntary, the confession is admitted. In contrast, in New York and certain other

850, 100 L.Ed. 1476. Thereafter a federal writ of habeas corpus was issued by Judge Smith. Without having before him the entire record of the state court proceedings, Judge Smith took testimony and made independent findings of fact. He found the first confession to have been coerced in violation of the due process clause of the Fourteenth Amendment, and ordered the judgment of conviction vacated. Judge Smith's opinion is reported in D.C., 154 F.Supp. 663, sub nom. United States ex rel. Rogers v. Cummings. On appeal this order was reversed and the cause was remanded with directions to Judge Smith to examine the entire state trial record. United States ex rel. Rogers v. Richmond, 2 Cir., 252 F.2d 807, certiorari denied 357 U.S. 220, 78 S.Ct. 1365, 2 L.Ed.2d 1361. The opinion of this court, 252 F.2d at page 811 stated:

"We conclude therefore, that on remand the judge below should take such steps as will assure him that he has in evidence not only the findings of the trial court as to the admissibility of the confessions but also the transcript of the preliminary hearing on which the trial findings were based. Unless the judge below shall find in the record thus before him material which he deems to constitute 'vital flaws' and 'unusual circumstances' within the meaning of Brown v. Allen, we hold that he should make the necessary constitutional determinations exclusively on the basis of the historical facts as found by the State trial court. Brown v. Allen, 344 U.S. [443] at pages 507–508, 73 S.Ct. [397] at page 446, [97 L.Ed. 469]."

In denying certiorari the Supreme Court wrote a Per Curiam opinion which reads as follows:

"The petition for writ of certiorari is denied. We read the opin-

states, the question of coercion is submitted to the jury with all the other facts and a general verdict found. Hence, decisions such as Spano v. People of State of New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265, are not applicable.

ion of the Court of Appeals as holding that while the District Judge may, unless he finds a vital flaw in the State Court proceedings, accept the determination in such proceedings, he need not deem such determination binding, and may take testimony. See Brown v. Allen, 344 U.S. 443, 506, et seq., 73 S.Ct. 397, 445, 97 L.Ed. 469." [357 U.S. 220, 78 S.Ct. 1365.]

After remand Judge Smith received in evidence the entire transcript of the state court proceedings. Included in the findings of the state trial court was the specific finding that "the accused did not at any time on the day of the questioning request the presence or assistance of an attorney." [1] In the original federal hearing which resulted in the order vacating the conviction, Judge Smith found that Rogers had asked to see his lawyer during the period of questioning that led to the first confession, and he relied heavily upon this finding in holding that the confession was illegally coerced. In so finding, Judge Smith as a matter of credibility accepted the testimony of Rogers rather than that of other witnesses.

In his opinion after remand, D.C., **178** F.Supp. 69, Judge Smith proceeded to make his decision in accordance with the Supreme Court's interpretation as is evidenced by his statement that "this 'interpretation' by the Supreme Court, on its face, seems to mean that the District Judge, after examining the record of the state proceedings, is free to accept the state factual determinations in those proceedings and base his constitutional determination thereon, or to reject them and call for testimony on which to base his constitutional determinations * * *" He recognized that the opinion (Mr. Justice Frankfurter, Brown v. Allen, supra, 344 U.S. at page 506, 73 S.Ct. at page 445) "emphasizing the possibility that the facts have been tried and adjudicated

against the applicant, and implying that their determination may well be accepted in the absence of a vital flaw in their state court determination points to a standard to be followed" and that "something must appear upon examination of the state court record to require a trial de novo of the fact issues." Furthermore, he was well aware that the Supreme Court in its comment denying certiorari "makes it plain that there may be circumstances in which the judge may, after review of the state court record, decide to take testimony and not be bound by the state court findings, even though no vital flaw is necessarily found."

Judge Smith's own understanding of the broad scope of his power and review upon the remand is vital to a proper determination of this appeal. He did not regard himself as foreclosed from exercising his independent judgment or as in the role of a rubber stamp upon state court conclusions. To him "the question here is whether on review of the full trial court record [which he had not had before him when he delivered his previous opinion], testimony should be considered in a trial de novo." He knew that he was privileged to "take additional testimony not considered by the state trial court on constitutional issues, such as lack of due process by the use of coerced confessions, and make an independent determination of the facts, such as the voluntary character of confessions, and [that he] must independently determine whether the conviction may constitutionally stand" but that he might "not substitute his judgment on factual issues fairly tried (i. e., where no vital flaw exists) before a state court on similar evidence." With this appreciation of his powers and his duties and "considering the full state trial record anew, to determine whether other evidence should be considered," Judge Smith concluded that the writ should be dis-

---

1. On the day of the questioning Rogers was in jail awaiting trial on another charge unrelated to the indictment for

murder subsequently filed against him. He had retained counsel on the unrelated charge.

charged. In so doing, he ignored "the impressions" made on the trial before him prior to his consideration of the full state record and his own opinion that "on similar evidence, if properly before it, this court [he] would reach the opposite finding." The correctness of Judge Smith's holding that "Subsequent disagreement with his [the state trial court] weighing of essentially similar evidence is not in itself sufficient under the limitations now imposed in the interest of proper balance in our dual court system, to permit consideration of the matter heard at the trial of the issue de novo here" is the major question for decision upon this appeal.

However, if by "limitations" the question is raised as to the right of a federal judge or a federal appellate court to take an appellate record after conviction in a state court and appellate review and years after the trial upon the printed record substitute its own opinions as to credibility of witnesses (not seen), weight to be accorded to their testimony and inferences to be drawn therefrom (in other words, to make a redetermination of the historical facts), a much broader and more serious problem is presented. Is a convicted state prisoner, having been unsuccessful before a jury of his peers or a judge, to be able via habeas corpus to have his case re-tried by some federal judge in the district of his incarceration and, if so, is the federal judge to have the right to re-determine the historical facts? Such expressions as "relevant historical facts," "unusual circumstances" and "vital flaws" are not too helpful. They are not self-defining and do not lend themselves to objective use. The closeness of the fact question does not require that it remain unresolved but it does increase the likelihood that the minds of judges and jurors will differ widely in its proper resolution. Under our system of law, juries, and in certain cases judges, are charged with this responsibility. Where does it (or, better, should it) ultimately rest? Take a single case. It is tried and appealed twice in a state court, certiorari is denied.

Three, four or ten years later, a federal judge or appellate court takes a different view and decides to believe witness A instead of witnesses B and C as to coercion. Would it not have been better to have had the case tried originally before a federal judge so that the time and expense of the state proceedings could have been avoided? To be sure, the Congress had not yet adopted a statute reading, in effect, that a case involving a closely disputed question of fact as to the coercion of a confession shall not be tried and decided in a state court but no statute will be necessary if the courts by decision create the same result. Or as a short cut a federal judge might be called into the state court trial for the purpose of deciding the question then and there with the case held open pending an appellate court's views on the facts. Would not such a procedure face the problems more fairly than to indulge, in words, in solicitude for the preservation of the "delicate balance of federal-state relationships" and the avoidance of "serious federal-state tensions," yet at the same time, in decisions, to destroy any vestige of state autonomy.

Brown v. Allen, specifically referred to by the Supreme Court in its opinion as to Judge Smith's powers clearly supports the procedure adopted by him and the result reached. Both opinions in Brown v. Allen (Mr. Justice Reed and Mr. Justice Frankfurter) stress the difference between resolution of the factual issues and the determination of constitutional issues. Frequently expressed and implied therein is the thought that first the federal judge must ascertain the basic facts which may be in the state record. If they are not in the record, they may be supplemented by a hearing. These are the "historical facts, the external events that occurred." It is upon these facts that the federal judge is to decide whether the state court "may have misconceived a federal constitutional right." This thought was expressly covered by way of illustration in the opinion of Mr. Justice Frankfurter

wherein he said (referring to a fact situation most analogous to this case):

> "Moreover, the kinds of State adjudications differ. In some cases the State court has held a hearing and rendered a decision based on specific findings of fact; there may have been review by a higher State court which had before it the pleadings, the testimony, opinions and briefs on appeal. It certainly would make only for burdensome and useless reptition of effort if the federal courts were to rehear the facts in such cases" (Brown v. Allen, 344 U.S. at page 504, 73 S.Ct. at page 445).

This is the type of hearing and review given by the state court here. The entire emphasis in Brown v. Allen is upon a "denial of constitutional rights" based upon "the uncontradicted evidentiary facts" rather than on a retrial to redetermine credibility. This is the indicated area of federal review.

A reading of the alleged coerced confession cases in the Supreme Court over the last few years confirms this view. Thus, in the opinion of the court (Mr. Justice Frankfurter) in Watts v. State of Indiana, 1949, 338 U.S. 49, 50–51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801, the rule was stated: "On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State Courts and are not open for reconsideration by this Court. Observance of this restriction in our review of State Courts calls for the utmost scruple." In Gallegos v. State of Nebraska, 1951, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86, "neither judge nor jury accepted the testimony of Gallegos on disputed facts as to coercion" (342 U.S. at page 60, 72 S.Ct. at page 145). The Supreme Court, although recognizing that it was the responsibility of the Federal courts to make the ultimate determination as to the voluntary character of the confession, nevertheless said that because of the better opportunity afforded State agencies to appraise the weight of the evidence and to see the witnesses personally, this reason "leads us to accept their judgment insofar as facts upon which conclusions must be reached are in dispute" (342 U.S. at page 61, 72 S.Ct. at page 145). The court continued, "We [the court] give deference to the [State's] conclusions on disputed and essential issues of what actually happened" (342 U.S. at page 61, 72 S.Ct. at page 145).

Even as in Gallegos, here "The issue of federal due process now tendered is to be considered only on uncontroverted facts" (342 U.S. at page 62, 72 S.Ct. at page 146). Here Rogers, again even as Gallegos, testified to harsh treatment, but this testimony was seriously disputed and resolved by the court and jury, respectively, against them. The function of the Federal court in protecting a defendant against violation of his constitutional rights does not extend to passing upon issues of credibility or to picking and choosing from amongst the various witnesses whose testimony the court may choose to accept or reject.

In passing upon the constitutional issues, the court turns "to the undisputed portions of the record to ascertain the facts against which petitioner's claim of coercion must be measured" (Thomas v. State of Arizona, 1958, 356 U.S. 390, 393, 78 S.Ct. 885, 887, 2 L.Ed.2d 863). This principle was restated with even greater clarity in the same case, the court saying, "Whatever the merits of this dispute, our inquiry clearly is limited to a study of the *undisputed* portions of the record. '[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved [against petitioner] by the State's adjudication.' Watts v. State of Indiana, 1949, 338 U.S. 49, 51–52, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801. Time and again we have refused to consider disputed facts when determining the issue of coercion."

In this court, Chief Judge Clark cautioned against the "overturn by any federal judge of the reasoned conclusions

reached by a whole hierarchy of state tribunals." United States ex rel. Caminito v. Murphy, 2 Cir., 1955, 222 F.2d 698, 706. And, more recently, in United States ex rel. Wade v. Jackson, 2 Cir., 1958, 256 F.2d 7, this Court said that it would review and come to its own independent conclusion "If the undisputed facts disclose that a defendant's confession was involuntary, and it appears that without this evidence he would not have been convicted" (at page 9).

The trial judge's finding that Rogers had not asked to see a lawyer turned on a refusal to credit Rogers' testimony. Capt. Eagan, Assistant Chief of the New Haven Police, testified that Rogers did not ask him for permission to call counsel and that so far as he knew Rogers did not ask anyone else for permission to do so. At the hearing before Judge Smith, Rogers testified but Capt. Eagan did not. However, three detectives of the police force, who had participated in the questioning of Rogers but had not testified at the state trial, testified at the federal hearing that Rogers had not asked to see a lawyer. Judge Smith chose to credit Rogers' testimony. In his opinion on remand he explained that he had done so because it seemed probable that Rogers would ask to see the lawyer who was already representing him on the other charge, and because the recollection of the police officers after so long a period of time would be likely to coincide with what they subconsciously would prefer. Hence, it appears that Judge Smith and the state trial judge reached opposite conclusions on the factual issue whether Rogers asked to see his counsel solely because each reached a different conclusion as to Rogers' credibility. We see no valid reason for substituting the intuitive inferences of an able and conscientious federal judge on the issue of credibility for those of an able and conscientious state trial judge, where the evidence before each was essentially similar as Judge Smith said it was.

▉ However, in a habeas corpus proceeding the federal district judge must make his own determination as to the legal significance of historical facts and the application of constitutional principles to the facts as found. In the words of Mr. Justice Frankfurter in Brown v. Allen, 344 U.S. at page 507, 73 S.Ct. at page 446: "For instance, the question whether established primary facts underlying a confession prove that the confession was coerced or voluntary cannot rest on the State decision."[2] Hence, accepting the historical fact that Rogers had not asked to see counsel during the period of questioning, determination whether his constitutional rights were violated by use of the confession in his trial remained to be made by Judge Smith. He concluded that they were not violated. A majority of this court agrees.

▉▉ As Brown v. Allen points out, 344 U.S. at page 510, 73 S.Ct. at page 448, in habeas corpus petitions the Congress has designated the district court to be the instrument of the application of the superior authority of the federal law. Congress might have designated another member of "the hierarchy of the federal judiciary" to express that law but it chose the district court rather than the court of appeals or the Supreme Court. Therefore the district court's review on habeas corpus of a state conviction is not, "a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law." But since the application of federal law to state convictions has been assured by the district court's review, our review of the district court's judgment becomes

---

**2.** In Lisenba v. People of State of California, 314 U.S. 219, at page 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, the court said: "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false. * * * Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt."

the ordinary appellate review wherein a higher court sits in judgment of a lower court's determination. Accordingly, we ought to apply the normal "clearly erroneous" standard of review. Wade v. Mayo, 1948, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647; Palakiko v. Harper, 9 Cir., 1953, 209 F.2d 75, 93; Albert ex rel. Buice v. Patterson, 1 Cir., 1946, 155 F.2d 429, 433, seem clearly to dictate such a conclusion. See also Cranor v. Gonzales, 9 Cir., 1955, 226 F.2d 83, 94.

The facts concerning the making of the confessions are set out in detail in an Appendix to this opinion, which reproduces pages 314–320 of appellant's Appendix A. We need not restate them.

The fact that Rogers was taken from jail to the State's Attorney's office without a court order could not have affected the voluntariness of his confession since he was unaware of it. Finding 106.

The manner in which he was questioned does not appear to have been abusive nor so prolonged as to warrant the conclusion that his first confession was coerced.[3] It should be emphasized that Rogers was not an indicted defendant but a suspect who was being questioned in the course of investigating an unsolved crime, a distinction often recognized by the Supreme Court.[4] Moreover, Rogers was no novice in respect to contact with the police. His brother was a police officer. At the time of the questioning Rogers was under arrest on a charge of robbery and had previously been under arrest on three other occasions. He was 46 years of age and the state trial court found him "highly intelligent," although his formal education was only through the eighth grade. A man of his age, intelligence and experience is not likely to be frightened into confessing to murder by questioning in the manner here employed.[5]

■ Rogers claimed at the trial that he confessed because he did not want his wife brought in for questioning when she was practically crippled with arthritis. Assuming she was crippled, although no proof of it was offered at the trial, there is no evidence that Capt. Eagan was aware of her condition. The only objection made to him when he threatened to bring the wife in for questioning was that she didn't know anything about the murder. She was a legitimate subject of police inquiry.[6] In the absence of evidence that the police knew of Mrs. Rogers' arthritic condition and sought to take advantage of it to pressure Rogers into a confession, his decision to shield his wife from questioning does not, in our opinion, render his confession involuntary within the meaning of the due process clause of the Fourteenth Amendment.

■ We have concluded that the police questioning of Rogers did not render his first confession involuntary. We also hold that Rogers' second confession was not a product of coercion. This second confession was made to the coroner some 16 or 17 hours after the police questioning that led to the first confession had ceased and after the coroner had informed Rogers of his right to remain silent and of his right to counsel.

The court expresses gratitude to assigned counsel for their very competent services in representing the appellant.

For the reasons above stated the judgment discharging the writ is affirmed.

### Appendix

Below are set forth pages 314–320 of Appellant's Appendix A.

### Sixth

*Hearing on Admissibility of Exhibit VV*

The State through Assistant Chief of Police Raymond Eagan sought to offer

---

3. Cf. Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265.

4. Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448; Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523; In re Groban's

Petition, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376.

5. See Stein v. People of State of New York, 346 U.S. 156, 185–186, 73 S.Ct. 1077, 97 L.Ed. 1522.

6. See Stein v. People of State of New York, supra, 346 U.S. 184, 73 S.Ct. 1077;

in evidence the statement made by the accused on the night of January 30, 1954, whereupon the Court in the absence of the Jury conducted a hearing on the admissibility of such evidence.

On the evidence adduced on this issue the following facts were proven:

71. On Saturday, November 21, 1953, the body of Mrs. Dorothy Kennedy was found in the West Shore Package Store under circumstances indicating that she had died from bullet wounds during the course of a robbery committed by a person unknown.

72. Thereafter investigations into this crime were conducted by the West Haven Police and other prosecuting authorities to no avail.

73. On the evening of January 9, 1954, the New Haven Police arrested the accused on charges of crime committed that day at the Travelers Hotel in New Haven.

74. At the time of his arrest the accused had in his possession a loaded 38 calibre Smith & Wesson revolver.

75. The accused was questioned by police that evening and claimed he had won the gun in a "crap game" that day.

76. On being questioned further on the following day the accused admitted having stolen the gun from the home of his nephew George Evans.

77. On January 13, 1954, the accused was bound over by the City Court of New Haven to the April Session of the Superior Court on charges of Attempted Robbery while Armed, Breaking and Entering, Theft, and Carrying a Revolver in Motor Vehicle.

78. In the hearing of these charges in the City Court the accused had retained Attorney Thomas R. Robinson as his counsel but no appearance had been filed by any attorney on behalf of the accused in the Superior Court proceedings.

79. Following the City Court hearing the accused in default of bail was lodged as a prisoner in the New Haven County Jail on the mittimus issued by the Clerk of that Court.

80. On the morning of January 30, 1954, the State's Attorney's Office of New Haven County ascertained from ballistic tests that the gun found in the possession of the accused at the time of his arrest on January 9, 1954, had fired the bullets which killed Mrs. Kennedy on November 21, 1953.

81. Thereupon a letter from the State's Attorney's Office was delivered to the Jailer requesting him to permit police officers to take the accused to the State's Attorney's Office for questioning.

82. In compliance with this request, the accused was presented at the State's Attorney's Office shortly after noon.

83. During his first hour at the State's Attorney's Office the accused was not questioned at all.

84. Thereafter on questioning by the officers he denied knowledge of or implication in the murder of Mrs. Kennedy.

85. During this questioning and at all times while at the State's Attorney's Office the accused was seated in an armchair, his handcuffs released so that the cuffs were attached to only one wrist and his hands and arms free.

86. The accused was permitted to smoke cigarettes and did smoke during the afternoon and evening, some of the cigarettes being furnished by police officers in attendance.

87. At about 4 o'clock in the afternoon he was given a sandwich and coffee which he consumed.

88. In response to a telephone call Assistant Police Chief Eagan arrived at the State's Attorney's Office about 8 p. m. and. thereupon proceeded to question the accused further.

89. The accused persisted in his denials and during the course of the questioning Chief Eagan informed the accused he was intending to send for the accused's wife in order to question her

Vogt v. United States, 5 Cir., 156 F.2d 308, 312; Hawkins v. United States, 81 U.S.App.D.C. 376, 158 F.2d 652, 653– 654, certiorari denied 331 U.S. 830, 67 S. Ct. 1347, 91 L.Ed. 1844.

as to any knowledge she might have of the affair.

90. Chief Eagan then pretended to put through a telephone call to Police Headquarters stating, in the hearing of the accused, that he would call the officers later with respect to sending for Mrs. Rogers.

91. During the hour following this fictitious call Chief Eagan questioned the accused further and also asked him if he wanted anything to eat and the accused requested coffee.

92. Chief Eagan then indicated he was ready to call the officers again to instruct them to bring Mrs. Rogers to the State's Attorney's Office whereupon the accused announced his readiness to make a statement.

93. After a few brief admissions by the accused, one of the Official Court Reporters was summoned and a stenographic record was made of the statements made by the accused in response to questions by Chief Eagan, which statement is Exhibit VV.

94. At the conclusion of the statement the accused signed the stenographic notes.

95. Although the statement started about 10:40 p. m. and ended about midnight there were interruptions for coffee, cigarettes and short recesses.

96. At no time was the accused subjected to continuous or extended questioning.

97. No force, threats or inducements were made or offered to the accused at any time.

98. The accused acknowledged at the trial that he was not abused and made no complaint at any time of his treatment by the police.

99. The treatment of the accused by the investigators was at all times considerate.

100. The accused had experienced previous arrests and interrogations by the police and the treatment accorded him on this occasion did not adversely affect him.

101. The accused did not at any time on the day of the questioning request the presence or assistance of an attorney.

102. The accused answered the questions put to him directly and unhesitatingly.

103. The pretense of placing a telephone call for Mrs. Rogers had no tendency to produce a confession that was not in accord with the truth.

104. Neither at the trial or in his Claims of Proof on this Appeal did the accused make any claim that his statement admitting the shooting of Mrs. Kennedy was untrue.

105. The delivery of the accused to the State's Attorney's Office and his presence there on January 30th were not unlawful.

106. If there was any element of irregularity or illegality in his presence at the State's Attorney's Office on that date, the accused was not aware of it and it had no effect upon him and there was no causal connection between it and his confession.

107. The statement made by the accused to the police on this date was freely and voluntarily made and accordingly was admissible in evidence.

Seventh

*Hearing on Admissibility of Exhibit WW*

The State through Coroner James J. Corrigan sought to offer in evidence a statement made by the accused at the Inquest conducted by the Coroner on January 31, 1954, whereupon the Court in the absence of the Jury conducted a hearing on the admissibility of such evidence.

On the evidence adduced on this issue, the following facts were proven:

108. On January 13, 1954, the accused was bound over by the City Court of New Haven to the April Session of the Superior Court on charges of Attempted Robbery while Armed, Breaking and Entering, Theft, and Carrying a Revolver in Motor Vehicle.

109. In the hearing of these charges in the City Court the accused had retained Attorney Thomas R. Robinson as his counsel but no appearance had been filed by any attorney on behalf of the accused in the Superior Court proceedings.

110. Following the City Court hearing the accused in default of bail was lodged as a prisoner in the New Haven County Jail on the mittimus issued by the Clerk of that Court.

111. On the morning of January 30, 1954, the State's Attorney's Office of New Haven County ascertained from ballistic tests that the gun found in the possession of the accused at the time of his arrest on January 9, 1954, had fired the bullets which killed Mrs. Kennedy on November 21, 1953.

112. During the morning of January 31, 1954, James J. Corrigan, Coroner for New Haven County, was informed that the accused had on the preceding evening confessed to the police his murder of Mrs. Kennedy, and the Coroner thereupon instructed that he was issuing a warrant to hold the accused incommunicado at the County Jail.

113. During that morning Coroner Corrigan was for several hours engaged in the investigation of a gas explosion that caused several deaths that day.

114. About noon on that day Attorney Chester T. Corse, an office associate of Attorney Robinson, asked the Sheriff for permission to see the accused and was informed by the Sheriff that the accused was being held incommunicado on the Coroner's order.

115. Shortly afterwards, the Coroner's warrant was delivered to the Sheriff at the Jail directing him to hold the accused at the County Jail pending further orders from the Coroner.

116. In the later afternoon of that day the Coroner telephoned the Sheriff and asked that the accused be brought to the Coroner's Office for questioning.

117. Thereupon the Sheriff delivered the accused to the Coroner's Office and the Coroner administered to the accused the usual oath.

118. Before proceeding to interrogate the accused, the Coroner cautioned him as to his constitutional rights, informing him that he was under no duty to answer questions and that he had the right to refuse to give testimony and that any testimony he might give might be used against him.

119. The accused was further told by the Coroner that he had the right to be represented by counsel if he wished.

120. The accused after hearing the cautionary remarks of the Coroner, stated that he understood his rights and averred his willingness to testify.

121. No threats of harm or promises of reward were made by the Coroner to the accused.

122. The accused understood the language used by the Coroner and the rights afforded to him under the Constitution of the United States and the laws of this State.

123. The accused is highly intelligent and fully comprehended the statements made to him by the Coroner.

124. The accused was the brother of a police officer and had experienced previous arrests and interrogations by the Police.

125. The accused did not ask to be represented by counsel.

126. The accused voluntarily chose to testify after hearing from the Coroner that he was entitled to counsel and that anything he said might be used against him.

127. The accused answered the questions calmly and voluntarily.

128. The questioning by the Coroner lasted about an hour and one-half and thereupon the accused was returned by the Sheriff to the County Jail and his incommunicado status was released the following day.

129. The delivery of the accused to the Coroner's Office and his presence there for questioning were not unlawful.

130. If there was any element of irregularity or illegality in his presence at the Coroner's Office on that day, the accused was not aware of it and it had no effect upon him and there was no causal connection between it and his confession to the Coroner.

131. The statement made by the accused to the Coroner was substantially the same as that made by him the previous evening to the Police.

132. The statement of the accused was freely and voluntarily made and accordingly was admissible in evidence.

CLARK, Chief Judge (dissenting).

No federal judge can contemplate with pleasure or even equanimity the obligation, now imposed upon him by constitutional principles defined by our highest court, of examining anew the fairness of confessions received in state capital cases and accepted by the state courts. But there is no question of our duty and responsibility in the premises, and if we are not to make of this a meaningless and illusory gesture we must bring to it all the powers of independent thought and analysis of which we are capable. Since here I find my own conclusions at variance with the views of a number of judges, state and federal, whom I highly respect, the task is indeed disagreeable. Some solace is discoverable, however, in the fact that two unusually restrained judges, Justice (later Chief Justice) O'Sullivan in the state court and Judge Smith in the federal court, have reached conclusions substantially similar to my own. I am led by this circumstance, coupled with the additional facts that the police methods in obtaining the accused's confessions were harsh and deceitful and the confessions themselves concededly a tissue of lies in their assertion of prior intimacies with the victim, to believe that the State itself here cannot and will not ultimately allow this defendant to be put to death until he has had a fairer trial. We cannot, however, anticipate action by the State's Chief Executive and must reach our own conclusion on this issue when presented on federal habeas corpus.

The court below and my brethren accept as crucial the question whether the federal trial court may make its own findings or is bound by the state court findings on important details such as, notably, whether relator asked during his interrogation to see his counsel. The question is obviously important, as everyone seems to concede that if the request was made and refused the confessions cannot be received. Hence I shall discuss it below. But I cannot believe it is final in the sense that rejection of Judge Smith's finding of such a refusal will necessarily authenticate the confessions. For it seems to me that on the admitted and incontrovertible facts these confessions cannot be considered "voluntary" in any real meaning of the word—indeed, that however they may be characterized, that adjective is singularly inappropriate. I suggest that the confessions would necessarily be inadmissible under English and under federal law. The lack of any proper admonitory caution by the police would be sufficient to vitiate them under the former, see Mr. Justice Devlin, The Criminal Prosecution in England 31–41, 137, 138 (1958); and that and other factors, including the lack of prompt arraignment with its resultant safeguards, would compel a like result under federal law. See discussion in United States v. Cleary, 2 Cir., 265 F.2d 459, 462, 463. Hence our real issue is whether a less rigorous standard is to be accepted as state due process of law. Spano v. People of State of New York, 360 U.S. 315, and cases cited at page 321, 79 S.Ct. 1202, at page 1206, 3 L.Ed.2d 1265.

Consider the facts, i. e., the "external" acts or events which are common ground here. I think the most complete, as well as judicious and succinct, statement (showing the admitted as well as disputed facts) is that of Judge Smith in his first opinion, D.C.Conn., 154 F.Supp. 663, 664–665, and I incorporate it here by reference. These facts are shortly summarized in his opinion on remand:

"Yet, there was the illegal removal from the jail to the office for interrogation, the illegal holding incommunicado, denial of access to his lawyer, questioning by different officers for some eight hours intermittently in relays, the faked phone calls about his wife and children, finally succeeding by inducing Rogers to abandon his denials and make the confession, repeated the next day before the coroner." D.C.Conn., 178 F.Supp. 69, 73. Note that whether or not relator made the request to see his counsel, it is clear that the police took no steps to remind him of his right to counsel or put him in touch with his lawyer, although they knew he had a lawyer and who the lawyer was. It is also admitted that the next day when relator was before the coroner his lawyer was specifically refused access to him. The pattern is clear, too, of a steady grilling while he was handcuffed to a chair; and when he did not break down, Chief Eagan was called in, who employed the ruse of pretending to send for his crippled wife, with the final compulsory admonition that he would be "less than half a man" if he forced them to take his wife and children into custody.[1] Surely by then he had to realize that he had only a dim future unless he confessed.

My brothers attach such importance to the detailed and numbered findings of the state trial court that they reproduce this material in their appendix. Now the basic facts there recited, without the embellishments added, do show the far from voluntary character of the confessions. But in thus lending emphasis to these elaborations upon the underlying facts, I think my brothers have overlooked the unique character of findings of fact in Connecticut appellate practice; for there they serve only as steps in appeal, and not as aids to the adjudication itself. So

on all appeals, civil and criminal, and in jury as well as court cases, findings are made after the judgment, but only on request of the appellant and with both sides submitting drafts thereof. Conn. Prac.Bk.1951, §§ 385–400, 406, 410, and Forms 558–563; Maltbie, Appellate Procedure in the Supreme Court of Errors of Connecticut 129 (2d Ed.1957). In practice the judge tends quite naturally to accept the version presented by the party for whom he has decided. So here the findings were filed five months after the decision and trial and were those presented by the State. Hence they include what are quite obviously argumentative conclusions or deductions which are not facts in any true sense, but do properly represent the State's claims as to the ultimate judgment to be rendered. An example is No. 103: "The pretense of placing a telephone call for Mrs. Rogers had no tendency to produce a confession that was not in accord with the truth." Certainly no judge can know this as a fact; he can only deduce it as a conclusion and one (I submit) with no obvious support in the record.

Particularly to be noted in this connection are the mutually inconsistent or alternative claims of Nos. 105 and 106; the first asserts that the delivery of Rogers to the State's Attorney's Office and his presence there on January 30 were not unlawful, while the second states that if there were illegality in that regard the accused was not aware of it, and it had no effect upon his confession. My brothers make much of this for reasons which are not clear to me. We are called upon to decide whether the admitted compulsion placed upon the accused transcended the bounds of due process. It would seem that the legality of his immediate detention would be a factor of some importance in mak-

1. My brothers say that there was no proof at trial that she was crippled, and then assume that Captain Eagan did not know of it to accept the conclusion that the ruse did not render involuntary the confession then obtained. But there are several answers to this. There was evidence at the trial below as to her condition, and Eagan's actions do not make sense unless he knew what it was. And since the question turns upon relator's, and not Eagan's, state of mind, I cannot see how the issue of specific knowledge by Eagan can have the critical importance it has assumed.

ing this test, while his knowledge or lack thereof of this one detail of illegality would be unimportant in the overall picture of compulsion. United States ex rel. Wade v. Jackson, 2 Cir., 256 F.2d 7, 13, certiorari denied Jackson v. United States ex rel. Wade, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158; Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 64, 66, 67, 69 S.Ct. 1352, 93 L.Ed. 1810.

And now I turn to the issue raised by Judge Smith's original finding (reiterated on remand if he was free to make it) that Rogers at his original interrogation asked to see his attorney and was refused this privilege. That finding had solid support of record in Rogers' very explicit testimony and in the natural probabilities. If he had the actual experience and knowledge of criminal prosecutions stressed by my brothers, it seems simply incredible that he did not call for his already retained counsel as soon as he found himself suddenly being charged with murder and grilled on the assumption that he was guilty. Only the most abject fear could have restrained him. At the state trial only Captain Eagan testified in denial of any request, and his testimony could not cover the crucial time of Rogers' earliest interrogation.[2] It is true that on the federal trial other police officers testified, some two and one-half years after the questioning, that their recollection was that he had not

made such a request. As Judge Smith observed on remand: "It is quite natural for their recollection after so long a period to coincide with the version they must subconsciously prefer." D.C.Conn. 178 F.Supp. 73. Thus Judge Smith's original finding, which he shows he would have reiterated had he felt free to do so, was and is quite soundly based and cannot properly be discounted on this appeal.

In their opinion my brothers hold that Judge Smith on remand, being more fully informed, was persuaded that he had been in error as to this fact and the state judge had been correct.[3] This hardly does justice to the qualms as to his power which Judge Smith showed and his own clearly disclosed reactions to the impact of the evidence before him. Perhaps the best evidence here is Judge Smith's own recital in his later opinion, D.C.Conn., 178 F.Supp. 71, and I refer to it as support for my conclusion. For he reiterates that "Whether we call it a vital flaw or unusual circumstance, or a substantial ground for exercise of judicial discretion in granting a hearing, something must appear upon examination of the state court record to require a trial de novo of the fact issues. * * * Unless, on consideration of the full record such grounds are found, this court must accept the findings of historical fact in reaching its determination on the constitutional issues. This court is

---

**2.** Thus on such a record Judge Smith's finding is amply justified, and the restrictions we have placed in our two appeals on his power to find facts far exceed those recognized by an appellate court passing the facts in review. It is to be noted that on this record the Supreme Court of Errors of Connecticut assumed on appeal that Rogers asked for counsel and Justice O'Sullivan, dissenting, stated flatly: "He immediately asked to see his lawyer." State v. Rogers, 143 Conn. 167, 120 A.2d 409, 412, 415.

**3.** The reiterated statement that Judge Smith's first opinion was rendered without the benefit of the full state record, while literally true, gives an emphasis to that factor which is rather misleading. Actually it now appears that the

judge, who had accepted all of the state transcript offered by either party, had before him in the original trial all of the testimony relating to the voluntariness of the confessions given in the state trial court in the absence of the jury, except that of two witnesses in no way bearing upon the issue of relator's request for his counsel: the testimony of the deputy jailer as to the circumstances under which relator was removed from the jail to the State's Attorney's Office for questioning and the testimony of the sheriff as to keeping relator incommunicado from his counsel the next day on the coroner's orders. The only matters added later bearing at all upon disputed issues are the belated findings reproduced in my brothers' appendix which I have criticized in the text above.

bound by the findings of the state trial court that no request for counsel was made, and that the confessions were voluntary, unless some vital flaw or unusual circumstance exists or some other basis appears for consideration of testimony outside the record." And I have quoted above the conclusions of fact he would have made but for "the limitations now imposed."

Though my brothers rather make light of it, it is clear that the Supreme Court's actual denigration of our previous decision, while failing to reverse it outright, Rogers v. Richmond, 357 U.S. 220, 78 S.Ct. 1365, 2 L.Ed.2d 1361, did create some problems of interpretation, as commentators were quick to discover. 58 Col.L.Rev. 895; 72 Harv.L.Rev. 77, 93; 68 Yale L.J. 98. Naturally Judge Smith faced somewhat of a dilemma in having two appellate masters to serve, while he did have to act in the light of the fact that his earlier decision stood reversed. I am quite clear, however, that he was too modest and that under the Supreme Court ruling he was both entitled and bound to act normally as a judge and thus to credit his own natural and sincere judicial conclusions.[4]

Indeed, my brothers do not in terms disavow this interpretation, but their ambivalent attitude toward this issue now so crucial in American criminal procedure comes to that result in substance. They imply that the federal trial judge has a considerable reservoir of power (here untapped); but eventually they accept and approve the limitations on his power which are here shown to be completely stultifying. If a "vital flaw" or "unusual circumstance" is (a) necessary to release a federal judge into action and (b) is not to be found where the state trial did not produce all the witnesses covering the entire crucial time period, but did show the elements of coercion noted above, such as the handcuffing to a chair, it would seem unlikely

that the necessary elements will ever be found. Hence the federal constitutional review of coerced confessions as violative of due process will become quite, if not wholly, illusory.

For in all these cases coming to the federal courts there has been some finding by the state trier of facts (whether court or jury) that the confessions are voluntary. This is the issue upon which federal judges must pass in testing whether or not constitutional principles of due process of law have been observed. How can they do anything but rubber-stamp the state holding if they must accept the facts as found during the heat of the contested trial which in its entirety is now supposedly under sober and dispassionate review? I suggest that this case, like others, demonstrates that we cannot fairly appraise the totality of acts and events relied on to show compulsion if we are to regard some of them, very likely the most crucial, as untouchable premises in our examination. Such unrealistic compartmentalizing of the important facts has not been attempted before either by us or by the Supreme Court. The contrary practice where the tribunal has not hesitated to make its own revaluation of the basic facts is illustrated by such cases as Leyra v. Denno, 347 U.S. 556, 74 S. Ct. 716, 98 L.Ed. 948; Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; and Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, and by a considerable body of our own precedents. See, e. g., United States ex rel. Corbo v. La Vallee, 2 Cir., 270 F.2d 513; United States ex rel. Sileo v. Martin, 2 Cir., 269 F.2d 586; United States ex rel. Wade v. Jackson, supra, 2 Cir., 256 F.2d 7, 13, 14, certiorari denied Jackson v. United States ex rel. Wade, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158; United States ex rel. Savini v. Jackson, 2 Cir., 250 F.2d 349; United States ex rel. Alvarez v. Murphy, 2 Cir.,

4. In my view the Supreme Court took the course it did to emphasize its view that the trial court should always take steps to have the state transcript available, while at the same time it admonished the judge to act judicially. This appears to be the significance of its reference: "See Brown v. Allen, 344 U.S. 443, 506, et seq. [73 S.Ct. 397, 97 L.Ed. 469]."

246 F.2d 871, 265 F.2d 497; United States ex rel. Caminito v. Murphy, 2 Cir., 222 F.2d 698, certiorari denied Murphy v. United States ex rel. Caminito, 350 U. S. 896, 76 S.Ct. 155, 100 L.Ed. 788; and see also Cranor v. Gonzales, 9 Cir., 226 F.2d 83, certiorari denied 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816.[5] It is also demonstrated by the many cases on our weekly motion calendars where we remand denials of habeas corpus for full hearing and the taking of testimony below. It seems to me rather late in the day to attempt to reverse this settled practice and principle of law.

Of course we cannot be insensitive to the problems faced by the police in a case of this character. Here a most abhorrent crime had remained unsolved for over two months; and when the police obtained a most promising lead pointing to Rogers as the criminal, the temptation to "sew up the case" was naturally strong. But our ideals of criminal prosecution, based on the English common law and embedded in our constitutions, do not permit the solution of criminal cases by forced confessions from persons seized as suspects. The rule of law which we herald as model for free peoples around the world does not permit us to follow such easy course; nor does Connecticut itself wish to do so.[6] That is why I do not believe this case is yet at an end. At any rate, I think Judge Smith's original decision, D.C.Conn., 154 F.Supp. 663, 665, setting aside the conviction, but giving the State an opportunity to arrange for a retrial if it so chooses, is the necessary and correct course for us.

5. United States ex rel. Blank v. Jackson, 2 Cir., 263 F.2d 185, is not opposed to, but in fact appropriately complements, this line of cases. It holds that where on *coram nobis* proceedings the state subsequent to the original trial has conducted a full hearing with testimony and has then made a controlling finding of a crucial fact, the convicted accused cannot require the federal court to retry this issue.

6. The 1959 session of the Connecticut legislature passed a bill making statements

and confessions of an accused person inadmissible as evidence unless he had been properly arraigned and informed of his right to counsel. While Governor Ribicoff vetoed the particular bill because he thought it lacked proper safeguards such as the Judicial Council was now studying, he supported the general idea of the legislation, saying that its purpose "was completely in accord with our concepts of basic justice and fairness, and I concur with it." New Haven Register, July 2, 1959, p. 1, col. 6.